Robert Alton HARRIS, Petitioner–
Appellant,

v.

Daniel VASQUEZ, Warden of
California State Prison at San
Quentin, Respondent–Appellee.

No. 90–55402.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 14, 1990.

Decided Aug. 29, 1990.

As Amended Nov. 19, 1990.

Second Amended Opinion Aug. 21, 1991.

Rehearing and Suggestion for Rehearing
En Banc Denied Nov. 8, 1991.

Mandate Stayed Pending Application
for Writ of Certiorari Nov. 15, 1991.

Charles M. Sevilla and Michael McCabe, San Diego, Cal., and Michael Laurence, San Francisco, Cal., for petitioner-appellant.

Jay M. Bloom, Supervising Deputy Atty. Gen., and Louis R. Hanoian, Supervising Deputy Atty. Gen., San Diego, Cal., for respondent-appellee.

Kent S. Scheidegger, Special Deputy Atty. Gen., Sacramento, Cal., for the amici curiae, States of Idaho, Arizona, Montana, Nevada, and Washington.

Before ALARCON, BRUNETTI and NOONAN, Circuit Judges.

BRUNETTI, Circuit Judge:

On March 6, 1979, Robert Alton Harris ("Harris") was convicted of two counts of murder and sentenced to death. On March 26, 1990, Harris filed his third federal petition for a writ of habeas corpus in the United States District Court for the Southern District of California. In this petition, Harris alleged that the state had denied him competent psychiatric assistance at trial, that the prosecution had presented false psychiatric testimony, and that newly discovered evidence showed he had organic brain damage and other mental disorders. Harris also asserted that he had been subjected to an unlawful interrogation, and had been denied effective assistance of counsel. Without holding an evidentiary hearing, the district court denied Harris's petition. We affirmed in a decision published at 913 F.2d 606 (9th Cir.1990). Prior to the issuance of the mandate, however, Harris filed a petition for a rehearing and a suggestion for rehearing en banc. On November 29, 1990, before we had completed our review of the petition for a rehearing, Harris filed a motion for a limited remand to the district court for an evidentiary hearing, based on newly discovered evidence, on the question whether Joey Abshire was a state agent at the time he had a connection with Harris. We granted Harris's request.

The district court conducted a hearing and found that the newly discovered evidence was not credible. We have reviewed the findings and conclusions of the district court and the supplemental briefs filed by both sides in this court. We have amended our opinion to consider the questions raised concerning the newly discovered evidence and the applicability of *McCleskey v. Zant,* — U.S. ——, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991), to Harris's third petition for a rehearing. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. *Facts of Harris's Crimes* [1]

Between the months of May and July of 1978, Harris twice asked his brother, Daniel, to help in a planned bank robbery. Harris told his brother that guns would be necessary for the robbery.

On July 2, 1978, Daniel stole two guns. On July 3, 1978, the two brothers purchased ammunition, went to a nearby rural area, and practiced firing the weapons by shooting at trees while running and rolling—a drill they considered appropriate in preparing for the bank robbery. On July 4, 1978, the two brothers purchased more ammunition and knit caps, in which they burned eye holes, to serve as masks in the bank robbery. They practiced shooting again that afternoon and then reconnoitered the area around the bank they intended to rob.

The brothers decided to steal an automobile for use as a getaway car. On July 5, 1978, the brothers saw a car parked in a grocery store parking lot across the street from the bank. John Mayeski, 15 years old, and Michael Baker, 16 years old, were in the car, eating hamburgers. Harris assured Daniel that nobody would be hurt, and then pulled his pistol and got in the back seat of the boys' car. With Daniel following in Harris's car, the boys' car was driven to the area where the brothers had been target practicing the day before.

Harris and the boys agreed that the boys should walk to the top of a fire trail, wait until Harris and his brother had left, and then report the car stolen, giving misleading descriptions of the thieves. When the boys began walking up the hill, Harris shot John Mayeski in the back. Harris fired another shot into Mayeski's head, and then ran after Michael Baker. Finding Baker crouching and screaming in the brush, Harris shot him four times. Harris then returned and shot Mayeski point-blank into his head. Finally, Harris took the rifle Daniel had been carrying and shot Mayeski again.

The brothers then left the murder scene and returned home, where Harris ate the remainder of the boys' hamburgers and laughed at Daniel for not having the stomach to join him. While the brothers continued to prepare for the bank robbery Harris laughed and giggled about shooting the boys, saying he had blown Michael Baker's arm off, and amused himself by imagining what it would be like to be a police officer and report the deaths to the boys' families. Harris laughed that from the point-blank shot he had blown John Mayeski's brains out and then flicked bits of flesh from the end of his pistol into the street. Later that day the brothers robbed the bank.

That same day the brothers were arrested for the bank robbery and taken into custody. When they were interrogated, Daniel informed the officers of the murders and confessed, placing the blame primarily on Harris. Harris listened to portions of Daniel's confession and he then confessed. At midnight, Harris and his brother were interviewed by Dr. Wait Griswold, a psychiatrist, concerning the murders and Harris told Griswold that he had shot the victims after assuring his brother they would not be hurt.

Harris and his brother were booked July 6, 1978, and the following day Harris repeated his confession in detail to Investigator Bolden. Harris confessed again the same day, an hour before his arraignment, to Officer Newman.

---

1. These facts are taken from *People v. Harris,* 28 Cal.3d 935, 171 Cal.Rptr. 679, 623 P.2d 240 (1981), the California Supreme Court opinion affirming Harris's conviction.

On July 15, 1978, Harris told his sister while she visited him in jail, "now I guess because I killed those two boys, they were only 16 years old, then robbed the bank and kidnapped them was because I really wanted to die." Harris's last extra judicial confession was made to a fellow inmate; when asked why he killed the boys, Harris answered, "I couldn't have no punks running around that could identify me, so I wasted them."

## II. *State Court Proceedings*

The court appointed Thomas J. Ryan ("Ryan") to represent Harris throughout the trial proceedings in state court. During Ryan's pretrial investigation, Ryan "became aware of" a psychiatric evaluation performed by Dr. Wait Griswold at the request of the district attorney and of a report summarizing Griswold's examination results. In his report, Dr. Griswold detailed his evaluation of Harris which included 10½ hours of psychological testing and scoring, 3 hours of psychiatric evaluation and report, and perusal of records, and stated:

> Mr. Harris was able to give a clear and concise description of his behavior, prior to, during, and following the alleged offense. It is the opinion that Robert Harris is legally sane in that at the time of the alleged offense he knew right from wrong and was aware of the nature and quality of his act.

> It is the opinion that:

> A. The accused was, at the time of the alleged offense, so far free from mental defect, disease or derangement, as to be able, concerning the particular act charged, to distinguish right from wrong.

> B. The accused was, at the time of the alleged offense, so far free from mental defect, disease or derangement, as to be able, concerning the particular act charged, to adhere to the right.

> C. The accused does possess sufficient mental capacity to understand the nature of the proceedings against him and to cooperate intelligently in his own defense.

Ryan hired two psychiatrists on a *confidential* basis to review Griswold's report and to investigate mental defenses such as insanity, diminished capacity, and potential mitigation at the penalty phase. Ryan provided these psychiatrists with all of the material he had relating to Harris's background. The state paid for these experts, authorizing $1,000.00 for Dr. Read and $250.00 for Dr. Rodgers.

Ryan was aware of the fact that in 1971 Harris had received an abnormal EEG tracing suggestive of organic brain damage. *See Harris v. Pulley*, 885 F.2d 1354, 1368 (9th Cir.1988) ("*Harris II*") The February 22, 1971, memorandum prepared by Dr. Joseph F. Aldrete stating the results of the abnormal EEG stated:

> Impression: Abnormal EEG tracing suggestive of *organic brain damage.*

> Deatils [sic]: This EEG is abnormal because of persistant [sic] dysrhythmias between the left frontal area and the right frontal area with theright [sic] being faster and sharper than the left. The left shows abnormal persistant [sic] slow waves.

> Results of the dysrhythmias between the right posterior temporal runs and the left posterior runs with the left being faster and sharper than the right. The right shows persistant [sic] slow fada waves with some very sharp waves interspersed.

> Comments: *The EEG tracing suggests organic brain damage localized at the rpesent [sic] time to the left posterior frontal area and right posterior temporal area.* This is felt to be secondary to chronic glue and solvent sniffing and if continued I would expect it to become generalized.

(Emphasis added.) Ryan explained that he did not use the abnormal 1971 EEG results during the guilt phase of Harris's trial because it would have been inconsistent with Harris's alibi defense. *Harris II*, 885 F.2d at 1368. Ryan was also aware of a subsequent EEG performed on Harris in 1977, only two years before the homicides, which demonstrated *normal* results.

At the guilt phase of Harris's trial, Harris denied that he had killed the boys; his chief defense was that his brother, Daniel, had committed the murders. Harris testified on his own behalf, admitting the bank robbery but denying the kidnapping, robbing and murdering the two boys. He explained his pretrial confessions as attempts to protect his brother. Harris did not present any psychiatric evidence and did not enter a plea of not guilty by reason of insanity pursuant to California Penal Code Section 1016(6).

As part of its case, the prosecution called Joey Abshire (aka Joey Ashworth), who was in custody on unrelated charges. Abshire occupied the same holding cell as Harris on July 26, 1978. Abshire testified that Harris said that:

> him and his brother took two boys up in the hills and after they got up there [Harris] told them to get out; one of them got out and [Harris] shot him. And [Harris] went around the other side and the other kid was crying and telling [Harris] not to shoot him and [Harris] shot him anyway.

When Abshire was asked if he had been in contact with law enforcement officials before speaking with Harris, Abshire stated "No, sir." The following exchange then took place:

> Q Were you acting on behalf of any governmental agents when you spoke to Mr. Harris?
>
> A No, sir.
>
> Q Why did you ask him those questions?
>
> A Well, I read in the paper and heard on TV about the charges and I just wanted to know why he killed those boys, that's why I was asking him.

Harris told Abshire that after shooting the boys the first time, one of the boys was still alive and he shot him in the head. Harris also said that, when leaving the scene of the murders, he was eating the boy's hamburger and thought it was funny because when he shot the boy in the head "something came back up on his gun." When asked if Harris had said why he had killed the boys, Abshire testified that Harris said it was because the boys could identify him.

The prosecution also called Charles E. Shramek, a sergeant in the San Diego County Marshal's Office assigned to the Chula Vista area. Shramek was on duty on July 26, 1978, and had escorted Harris to and from the holding cell on that date during an arraignment of Harris. Shramek testified that he "heard the entire conversation" between Harris and Abshire. Shramek testified that Harris said he killed the two boys because "they could identify me. I couldn't have no punks running around that could do that so I wasted them."

The jury convicted Harris of two counts of first degree murder, kidnapping, robbery, receiving stolen property, and possession of a concealable firearm by an ex-felon. *People v. Harris*, 28 Cal.3d 935, 943, 171 Cal.Rptr. 679, 623 P.2d 240 (1981). The jury also found the felony-murder and multiple murder special circumstances required under California law.

At the penalty phase, Harris testified that he lied to the jury at the guilt phase when he testified that he did not shoot the boys, and admitted that he did shoot them. However, he also testified that his brother had fired the first shot and that:

> When my brother—I didn't see him shooting. He was behind me. So he shot. I saw the boy like he was buckled. I knew he was shot, something told me he was shot, and I saw myself raising the gun and I shot him. I shot him again, and the next thing I was running and I shot the other boy.

Harris testified that he felt sorry that the murders happened and specified exactly when he felt that sorrow: when it happened, the next day to Officer Delis, at the time of trial, when he testified at the guilt phase of the trial and lied to the jury, and a week before trial when he was visited in jail by his friend Becky. He also told Becky that his attorney wanted him to testify that he was sorry.

To support his claim of remorse, Harris called Mr. Mendoza, a deputy sheriff assigned to the San Diego County Jail, where

Harris was confined. Mr. Mendoza was charged with the care of the inmates housed there. Mendoza testified that he had a long conversation with Harris about Harris's case; Mendoza wanted to find out something about Harris emotionally because he was charged with Harris's safety and custody, and that Harris "had cut his wrist on one occasion" and he "had heard that [Harris] had attempted to stab himself in the stomach with a pencil or in the chest." "[He] wanted to know if [Harris] was really serious about trying to kill himself, whether or not he felt he should die, and, I believe, he said something about the fact that he was willing to pay for what he had done." Mendoza also testified that Harris appeared to be remorseful about what he had done.

To *rebut* Harris's claim of remorse, the prosecution called Dr. Griswold, the psychiatrist who had examined Harris on the night of his arrest.[2] At the time of Harris's trial, Griswold had been a licensed, board-certified, practicing psychiatrist for approximately forty years, and had been a member, in good standing, of the American Psychiatric Association for at least thirty years. He was also a founding member of the American Academy of Forensic Scientists, and a member of the American College of Legal Medicine. He acted as a consultant to the California State Legislature and the California Department of Justice in their studies of violence and violent offenders. Dr. Griswold had considerable experience in the field of forensic psychiatry dealing with the psychiatric aspects of legal cases, and evaluation of suspects and defendants in major legal cases, and has testified as to his opinions regarding persons charged with crimes.

Griswold based his testimony, diagnosis, and opinion on his interview of Harris on July 6, 1978 and on a review of a battery of psychological tests given to Harris by Dr. Abigail Dixon, a psychologist in Griswold's office. Griswold considered the reports of the investigation of the crimes for which Harris was charged, reports of Harris's incarceration at various federal institutions, and in the California State Prison, and various reports of alleged attempts by Harris on his own life. Griswold also interviewed Harris's father regarding Harris's childhood. In making his diagnosis, Dr. Griswold relied on the Diagnostic and Statistical Manual of Mental Disorders, second edition, published by the American Psychiatric Association.[3]

Dr. Griswold testified that Harris had a personality disorder classified as "antisocial personality No. 304.8." (DSM II) When asked how such a personality "characteristically manifest[s] itself," Griswold stated that "usually these individuals are immature, emotionally unstable, they're callous, rather rigid at times, they're irresponsible, impulsive, egotistical, somewhat passively aggressive at times, *they seem to have an inability to profit from past experience or punishment.* They have a very low frustration scale, and they tend to rationalize in order to explain their behavior and their difficulty." (Emphasis added.) Griswold also testified that Harris's "suicidal gestures," appeared. to be feigned, and were consistent with his personality type. Finally, Griswold stated that he would not expect a person who was truly a sociopath and had committed the crimes of the type committed by Harris to truly feel remorse for these crimes and for killing the victims, but would expect such a

---

**2.** Defense counsel Ryan objected to the introduction of Griswold's testimony on the ground that it was not "proper rebuttal for anything that [had] been offered at this time." The prosecutor clearly stated that the purpose of Dr. Griswold's testimony was to rebut Harris's claim of remorse, to show that Harris suffers from an anti-social personality disorder, and that his suicide attempts were feigned, which is consistent with persons with an antisocial personality disorder. The court admitted the testimony for these purposes.

**3.** The Diagnostic and Statistical Manual of Mental Disorders (DSM) is published by the American Psychiatric Association to "provide clear descriptions of diagnostic categories in order to enable clinicians and investigators to diagnose, communicate about, study, and treat the various mental disorders." Diagnostic and Statistical Manual of Mental Disorders (3d ed. revised 1987). Since its initial publication in 1952, the Association has published a second edition (DSM–II), a third edition (DSM–III), and a third edition revised (DSM–III–R).

person to feel remorse for himself for being arrested and for being convicted.

Ryan conducted a well-organized and extensive cross-examination of Dr. Griswold, questioning every facet of Dr. Griswold's diagnostic process and diagnosis. During the cross-examination, Dr. Griswold produced three reports concerning Harris's psychiatric history and incarcerations in various federal institutions. Ryan stated that he had not seen two of the reports. He approached the bench and stated:

> Your Honor, I might also say *I would like an opportunity to present these reports to the psychiatrist that I retained some time ago* and who I provided with as much material as I had as to Mr. Harris's background. *I haven't decided yet whether I am going to call a psychiatrist* but I would like to have him have an opportunity to take a look at these reports.

(Emphasis added.) Ryan acknowledged, however, that the prosecution had provided him with everything in its possession, and assumed that the prosecution was also unaware of the reports. Ryan never called his psychiatrists to testify at the penalty phase.

Ryan questioned Griswold in detail regarding the causes and nature of Harris's antisocial personality, specifically Harris's "horrendous" childhood and family background and the fact that Harris had been struck and beat as a child by his father. He probed whether there was a medical cause for Griswold's antisocial personality diagnosis, and what effect rejection and physical abuse by his parents would have in developing an antisocial personality in Harris. Griswold testified that persons who were abused as children are more likely to suffer from this personality disorder, and that the disorder is something that is developed due to the way a person is brought up. The following dialogue took place concerning remorse:

> Q (Ryan) And in your opinion that person [an antisocial personality] would not show remorse?

> A (Griswold) Well, it doesn't hold true ironclad to all such individuals, but it is one of the typical characteristics, yes.
> Q And you can't say, can you, Doctor, whether or not Robert Harris feels remorse for these crimes.
> A Not precisely, no.
> Q You haven't examined him since July 7th, have you, or July 6th.
> A No, I have not.
> Q Have you observed his testimony here in this courtroom?
> A No, I have not.
> Q So you venture no opinion as to whether or not he is remorseful at this time?
> A No opinion except that I would doubt it very much.
> Q You doubt it very much because you diagnosed him as an antisocial personality?
> A That is true.
> Q But you have told us that an antisocial person can feel remorse; is that not true?
> A Oh, it is possible, but it is not likely.

Harris also called Evelyn Harris, his mother, and Barbara Jean Harris, his sister. Both women testified that Harris suffered extreme abuse as a child.

Evelyn Harris testified that her son, Harris, was born prematurely. She stated that her husband consistently denied Harris was his child until Harris was approximately twenty years old. She testified that Harris's father "was always mean to Robbie and he wouldn't let me ... show any affection to him," and that Harris's father struck Harris "lots of times." She also recounted one early instance of abuse:

> Robbie was about two years old and because he wouldn't eat something that [his father] put in front of him ... [his father] hit him and knocked him out of his high chair and ... wouldn't let me do nothing for him; [Harris's] nose bled so profusely that it bled clear through to the pillow.

Barbara Jean Harris testified that "Robbie was abused," and that Harris's "father was very abusive to [Harris's] mother."

Barbara Harris confirmed the incident when Harris was knocked from his high chair and that Harris was in convulsions, blood coming out of his mouth, nose and ears, and stated that Harris's father further tried to choke Harris with a table cloth. She also stated that her father beat Harris and other children "into unconsciousness several times when they were kids," and that Harris was abused from the time he was a little baby. She described in detail the harassment and abuse practiced on her and the rest of the children by their father, who was eventually sent to prison for child abuse and molestation.

The jury returned a verdict fixing Harris's punishment as death, and the trial judge denied Harris's motions for a new trial. The California Supreme Court affirmed Harris's conviction on direct appeal and denied a simultaneous petition for habeas corpus. The United States Supreme Court denied certiorari. Thereafter, Harris filed two state habeas petitions, two petitions for certiorari to the United States Supreme Court and two federal habeas petitions; all reviewing courts eventually denied Harris relief from his death sentence. See *Harris v. Pulley*, 885 F.2d 1354, 1358–59 (9th Cir.1988) for a complete procedural history prior to this petition.

### III. *Habeas Petition*

On March 26, 1990, Harris filed this third federal petition for a writ of habeas corpus (Petition) in the United States District Court for the Southern District of California. Harris now argues that his trial was constitutionally defective because:

(1) Harris was denied his constitutional right to psychiatric assistance at trial as set forth in *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), in that his two defense psychiatrists incompetently performed their evaluations of him; this deprived him of evidence showing that he did not premeditate and essential mitigating evidence for the penalty hearing;

(2) The opinions of psychiatrists who have recently examined Harris, which show organic brain damage and other "mitigating" disorders, constitute "newly discovered evidence" requiring a new trial;

(3) Harris is entitled to a new penalty hearing because Dr. Griswold's testimony was materially inaccurate;

(4) Harris was improperly convicted on the basis of an unlawful interrogation conducted by Joey Abshire, who Harris claims was a state agent;

(5) Harris was denied effective assistance of counsel;

(6) Harris's due process rights were violated when the trial judge refused to independently review Harris's sentence, as required by California law.

Brief For Petitioner–Appellant, (PB), pp. i–ii, viii–ix. Harris requested an evidentiary hearing on two issues: (1) whether the psychiatrists who assisted him at trial failed to perform their duties competently; and (2) whether the prosecution witness Joey Abshire was a government agent at the time he questioned Harris. District Court Order p. 34. Harris simultaneously filed an emergency application for a stay of his execution date which was set for April 3, 1990. *See id.*

Harris's petition was based primarily on the declarations of several psychiatrists, psychologists, and physicians who examined Harris within the last year. The new doctors received essentially the same information provided to Dr. Griswold and the two original defense psychiatrists, conducted their own independent examinations of Harris, and arrived at diagnoses that differ in some respects from Dr. Griswold's and each other's.

Dr. Karen Sees, a physician specializing in addiction medicine, conducted a physical examination of Harris [4] and concluded that Harris "has suffered throughout his life from fetal alcohol effect" and "very probably suffers from post-traumatic stress disorder." Petition Exh. B, pp. 21–23. Dr.

---

**4.** Dr. Sees also reviewed childhood medical records, portions of the penalty trial testimony, legal materials, social history reports showing Harris's abusive and disruptive childhood, and interviewed Harris's older sister Barbara.

Sees recommended that Harris be examined by a psychiatrist familiar with post-traumatic stress disorder. Dr. Sees stated that "it is likely" that Harris also suffers from organic brain syndrome. She did not, however, dispute Griswold's conclusion that Harris had an antisocial personality disorder.

Dr. Westley Clark, a psychiatrist, agreed with Dr. Griswold that Harris's symptoms fit the diagnosis of an antisocial personality disorder.[5] Petition Exh. A, p. 9. However, he stated that "Harris's records at youth and thereafter reveal a number of classic PTSD syndromes displayed over a considerable period of time; lasting well into his adult years and throughout the period in which the capital offenses were committed." *Id.*, p. 5. In Clark's opinion, Harris suffered throughout much of his adult life from a significant stress disorder caused by the physical and psychological abuse of his childhood. Clark stated that, at the time of the examination, Harris displayed "little of the symptomology of PSTD" as it appeared to Dr. Clark that Harris "affirmatively took the opportunity of a highly structured and relatively low stress environment of death row to weed out much of his PTSD symptomology and related behavior." *Id.*, pp. 5–6. Dr. Clark concluded, based on existing childhood medical records, Dr. Sees's findings, and other sources, that Harris "suffered from Attention Deficit Disorder (ADD) as a child" and that "this disorder persisted into his adult life." *Id.*, p. 6. Dr. Clark agreed with Dr. Sees's finding of fetal alcoholic effect, and thought there was "ample indications of

childhood head trauma, fetal alcohol exposure, and youthful substance abuse sufficient to cause organic brain damage by the time Mr. Harris reached adulthood." *Id.*, p. 8. Dr. Clark believes that Dr. Griswold's "testimony diagnosing Mr. Harris solely with an anti-social personality disorder ... was substantially misleading as a medical-psychiatric opinion," and that his report and testimony were simply wrong in certain material respects even as to his antisocial personality disorder diagnosis regarding instability to learn from experience and change behavior. *Id.*, pp. 9–10. Dr. Clark stated that "unequivocal ... statements that an anti-social personality cannot learn from experience" are wrong according to "established psychological and psychiatric knowledge," that "[u]nder certain circumstances, anti-social personalities can learn and modify their behaviors." *Id.*, p. 10.

Dr. R.K. McKinzey, a clinical psychologist, examined Harris for neuropsychological defects.[6] Petition Exh. J, p. 1. Dr. McKinzey performed four tests: Bender–Gestalt, Center's Background Interference Procedure, Rey's Memory Task, and Luria–Nebraska Neuropsychological Battery. He found that Harris was not malingering, tested negative for dementia but showed severe localized damage to the frontal lobes. He diagnosed Harris as having Organic Personality Disorder, frontal lobe type, relying on the characteristics of that disorder as stated in DSM–III–R. He claims that in 1975 during a psychiatric evaluation in conjunction with Harris's con-

---

**5.** Dr. Clark conducted a psychiatric examination of Harris and reviewed the results of Dr. Sees's examination, the 1977 report of Dr. Griswold and his testimony at Harris's penalty phase, other documents relating to Harris's medical and psychiatric history, the testimony of Harris's mother and sister at the penalty phase, and certain prison records.

**6.** Dr. McKinzey reviewed the statement of facts from the California Supreme Court opinion, the interview of Daniel Harris; the trial testimony and the probation report regarding Harris's prior manslaughter conviction; childhood medical reports; prison records; 1971 abnormal EEG report; Dr. Griswold's report; declaration of attorney Thomas Ryan to this petition; and the

recent mental state workups of Drs. Clark, Sees, Luckasson, Meloy and Missett. He noted from the prior records, among other things: the abnormal 1971 EEG demonstrating damage to the frontal and temporal lobes; the 1976 normal EEG; a 1978 normal skull x-ray; a 1975 average IQ test; a Rorschach test without psychosis; two normal Bender–Gestalt tests; an "ignored" abnormal Bander memory test; various data showing Average to Borderline range of intellectual functioning; signs of brain damage "again not remarked upon;" depression; confusion and poor ego strength; and consideration agitation. All this conflicting information was available to Dr. Griswold and the two retained defense psychiatrists.

viction for manslaughter, that one Dr. Pope improperly diagnosed Harris according to the signs detailed in DSM–III–R. McKinzey also concluded that Harris "meets the diagnostic criteria for Antisocial Personality Disorder," but felt that Harris's "violent, senseless assaults" were "more properly ascribed" to his organic personality disorder than to his antisocial personality. *Id.*, pp. 5–6. He concluded that a reasonable, adequate mental state work-up would have yielded the evidence of organic brain disorder and the mental disabilities which could have been used as defenses of reasonable doubt of premeditation or deliberation and to "substantially mitigate his mental culpability for the offenses if convicted." [7] *Id.*, p. 9.

Dr. James R. Missett, a psychiatrist, expressed the opinion that the psychiatrists retained by Harris's attorney with public funds "failed to meet the standard of care ordinarily expected of psychiatrists in death penalty evaluations." Petition Exh. H, p. 6. In reaching this conclusion, Dr. Missett reviewed the report of Dr. Griswold, the facts of the offense from the California Supreme Court decisions, the declarations of Drs. Clark and Sees, and "various early childhood medical records" of Harris. However, neither of Harris's trial psychiatrists was available and, for tactical reasons, Ryan deliberately chose not to have them prepare written reports.[8] Thus, Dr. Missett was compelled to rely exclusively on Ryan's declaration filed in support of the current habeas petition as "representing the sum of the available information regarding the efforts under-

taken by the psychiatrists retained for the defense." *Id.*, p. 2.

Ryan's declaration stated that, "[d]uring the course of [his] representation of Mr. Harris, [he] became aware of [the] psychiatric evaluation" performed by Dr. Griswold and Griswold's report indicating that Harris suffered from anti-social personality disorder. Petition, Exh. F, p. 1. Ryan "hired defense mental experts on a confidential basis to investigate mental defenses such as insanity, diminished capacity and potential mitigation at the penalty [phase]." He "provided the [defense psychiatrists] with materials related to the offenses, including police reports and the Dr. Griswold report." The psychiatrists also had materials provided by the district attorney.[9] *Id.*, p. 2. Ryan also stated that "to his knowledge," the psychiatrists' efforts "primarily consisted of interviewing Mr. Harris and evaluating him." *Id.*, p. 3. The psychiatrists did not ask Ryan for additional documentary materials and, "to his knowledge," they did not conduct neurophysiological testing such as electroencephalograms. *Id.*, pp. 2–3. Ryan stated that the psychiatrists "did not provide [him] with any helpful information to use in impeaching Dr. Griswold's testimony at the penalty phase," and claimed that he did not receive "any information from any source whatsoever that [Harris] suffered from organic brain syndrome, fetal alcohol effect, post-traumatic stress disorder or an attention deficit disorder." *Id.*, p. 2. Ryan claims that he would have introduced such evidence at the penalty phase trial if it had been available, and would have "considered its use" at the guilt phase on the issue of the mental state

---

7. It must be noted that the abnormal 1971 EEG showing frontal lobe damage was available to defense counsel Ryan, Dr. Griswold, and the defense psychiatrists. Ryan did not use this information during the guilty phase as it would be inconsistent with Harris's alibi defense. Ryan was also aware that an EEG test performed in 1977 produced a normal reading. Ryan does not recall considering using it at the penalty trial. *Harris II*, 885 F.2d at 1368. He did, however, inform the court he was considering psychological testimony during his cross-examination of Dr. Griswold.

8. Dr. Read is dead. Answer to Petition (Answer), Exhibit 2. Dr. Rodgers is abroad and may not be able to recall exactly what materials he reviewed in a case eleven years ago. See Answer, Exhibit 1. Moreover, Ryan hired the psychiatrists on "a confidential basis," Petition Exh. F and, for tactical reasons, chose not to obtain written reports. Thus, there is no record of the procedures used by the defense psychiatrists or the results of their examination of Harris.

9. These materials are the same materials which have been reviewed by Harris's current doctors.

for the special circumstances.[10] *Id.*, p. 2.

Harris's Petition contained more than 35 additional exhibits, including a declaration of Dr. J. Reid Meloy, a psychologist, and Professor Ruth Luckasson, an attorney and coordinator of Mental Retardation programs at the University of New Mexico. Dr. Meloy was asked by Harris's current defense counsel to give an opinion concerning the capacity of persons with antisocial personality disorders to learn from experience and as to the occurrence of a decrease in antisocial conduct as these persons progress in years. Dr. Meloy stated that, according to "early belief and convention in the mental health field," as reflected in DSM–II (1968), psychopaths were "assumed" to not learn from experience. Petition, Exh. C, p. 1. He then recognized that this statement is outmoded, has been dropped as a description of the disorder in DSM–III (1980) and DSM–III–R (1987). He quotes from his book on the subject and finally concludes that psychopaths "do significantly less well" at learning from punishment, but can learn as well as non-psychopaths from positive reinforcement. *Id.*, p. 2. Dr. Meloy also stated that reliable evidence indicates that "antisocial behavior significantly diminishes around the age of forty, but further states that the reasons for this diminution in conduct is unclear." *Id.*, p. 2.

Professor Luckasson reviewed Dr. Griswold's report, the declarations of other doctors described above, and materials related to Harris's background. Petition, Exh. K, p. 1. Luckasson also interviewed Harris at San Quentin on March 11, 1990 and gave Harris an intelligence test. Luckasson concluded that Harris had "impaired intellectual ability of lifelong duration." Luckasson disagreed with Dr. Griswold's diagnosis and opinion and also stated that Dr. Griswold's report was "deficient in that it failed adequately to assess or describe Mr. Harris's serious intellectual problems," *Id.*, p. 2. However, she made no comment regarding the assistance of the two appointed defense psychiatrists.

Without conducting an evidentiary hearing, the district court denied Harris's Petition and his request for stay on March 28, 1990, and the court issued its memorandum decision the following day. On March 28, 1990, Harris filed his notice of appeal of the district court's order. The district court denied Harris a certificate of probable cause.

## IV. *Appeal*

On March 30, 1990, Harris filed in this court an emergency application for a stay of execution and issuance of a certificate of probable cause. On March 30, 1990, under the rules of this court, a single judge issued the stay and the certificate of probable cause.

The Attorney General of California immediately applied to the Supreme Court of the United States for an order vacating the stay order issued on March 30. On April 2, 1990, the United States Supreme Court denied the application.

On appeal, Harris argued that the district court erred in denying his Petition and in refusing to conduct an evidentiary hearing. Harris also argued that, upon remand, the case must be transferred to a different district judge.

On August 29, 1990, we affirmed the district court's denial of Harris's Petition.[11] *See Harris v. Vasquez,* 913 F.2d 606 (9th Cir.1990) (as amended). While Harris's petition for rehearing of this decision was pending before this court, Harris filed a motion to remand to the district court for an evidentiary hearing on the issue of whether Abshire was a state agent at the time he questioned Harris in his cell. This motion was based upon newly obtained declarations of Abshire and another inmate in

---

**10.** The accuracy of Ryan's declaration is suspect in this regard. Ryan knew of the 1971 abnormal EEG suggesting organic brain damage. Ryan decided not to use Harris's abnormal 1971 EEG results during the guilt phase of the trial because it would have been inconsistent with Harris's alibi defense.

**11.** In the decision affirming, we did not need to decide whether to grant Harris's request to transfer the case to a different judge on remand. We implicitly rejected this request when we subsequently granted a limited remand.

Harris's cell, Sonny Wisdom. We held that "the presentation of these declarations require[d] an evidentiary hearing" and granted the motion. *See Harris v. Vasquez*, 928 F.2d 891, 893 (9th Cir.1991). The district court was instructed to "determine whether the failure to produce earlier the declarations ... constitutes an abuse of the writ of habeas corpus[, and] ... whether, in light of the existing record in this case and the evidentiary findings made pursuant to [the limited remand] order, Harris has shown this case warrants federal habeas relief." *Id.*

On April 16, 1991, the Supreme Court decided *McCleskey v. Zant*, —— U.S. ——, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991), which held that the proper standard for determining whether a habeas petitioner has abused the writ is identical to the standard applied when deciding if a petitioner's state procedural default should be excused. *See id.* 111 S.Ct. at 1468. On April 23, 1991, we ordered the district court to consider, in conjunction with the requested evidentiary hearing, the impact, if any, of *McCleskey* on the issues raised in the hearing.

The requested evidentiary hearing was held between May 7, 1991, and May 14, 1991. On May 21, 1991, the district court concluded that Harris's Sixth Amendment rights were not violated by Abshire's questioning of Harris because "[t]he evidence demonstrated that Abshire was an informer, but not a government agent." Because Abshire was not a state agent, the court reasoned, Harris's claims that the state violated his rights to disclosure of exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), to a trial free from state initiated perjury under *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), and to a penalty trial free from misleading information under *Johnson v. Mississippi*, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988), also failed.

We requested and received additional briefing on the district court's decision. In addition to addressing the district court's decision on remand, we requested the parties discuss the applicability, if any, of *McCleskey* to each of the issues raised in Harris's pending habeas petition. Harris argues: (1) He has not abused the writ as to any of his pending habeas claims under *McCleskey* which, Harris argues, cannot be applied to his case retroactively under *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989); (2) He was denied a full and fair hearing pursuant to our remand order; and (3) Abshire's testimony regarding his plea bargain during trial was false and requires habeas relief.

## DISCUSSION

We review the district court's denial of Harris's petition for a writ of habeas corpus de novo. *Norris v. Risley*, 878 F.2d 1178, 1180 (9th Cir.1989). A district court's findings of fact are reviewed under the clearly erroneous standard. *Id.*

### V. *Rule 9*

■ The State of California contends that each of the claims in this third federal habeas corpus petition is barred by Rules 9(a) and 9(b) of the Rules Governing Section 2254 Cases in the United States District Courts. *See* 28 U.S.C. § 2254 foll. Rule 9 (1988). We agree that Rules 9(a) and 9(b) provide a basis for dismissal of Harris's petition.

■ Rule 9(a) provides that a habeas claim may be dismissed upon a showing that: (1) the state has been prejudiced in its ability to respond to the claim; and (2) this prejudice resulted from petitioner's delay; and (3) the petitioner has not acted with reasonable diligence as a matter of law. *Id.* As the district court correctly concluded in denying Harris's third petition, the state was prejudiced in its ability to respond to Harris's *Ake* claim and new evidence claim because it now cannot depose either of Harris's trial psychiatrists. Dr. Read is dead. Answer, Exhibit 2. Dr. Rodgers is abroad and may not be able to recall exactly what materials he reviewed in a case eleven years ago. Answer, Exhibit 1.

It is also clear that this prejudice resulted from Harris's nine-year delay in raising these claims. Defense counsel hired the defense psychiatrists on a confidential basis and, for tactical reasons, chose not to have the psychiatrists prepare written reports at the time of their examinations of Harris. Harris did not bring his *Ake* claim or new evidence claim until 1990, although all the background material relied upon by Dr. Griswold, furnished to his two original defense psychiatrists, and used by his present doctors was within his knowledge and control for more than five years after *Ake* was decided.

Harris did not raise these claims with reasonable diligence because he has had the allegedly defective diagnoses and has been aware of the facts supporting his new diagnoses since 1978. Organic brain damage is not new in Harris's medical history. Thus, Rule 9(a) allows for dismissal of Harris's *Ake* claim and new evidence claim.

■ Rule 9(b) allows for dismissal of a "second or successive petition" if it fails to allege a "new or different ground for relief and the prior determination was on the merits." 28 U.S.C. § 2254 foll. Rule 9(b) (1988).

In earlier petitions, Harris brought ineffective assistance of counsel claims and a due process claim based on the failure of both his counsel and the state to obtain an additional EEG to pursue evidence of brain damage. *See Harris II,* 885 F.2d at 1365–68. Harris's *Ake* claim is similar to these earlier claims; the difference is that now Harris has obtained further mental state investigations, has found psychiatrists with new opinions, and claims that this "new evidence" shows he was denied his rights under *Ake,* a case grounded on the due process clause. However, the facts and circumstances relied on by the new psychiatrists are identical to those which Harris has argued in support of his ineffective assistance of counsel claims and due process claim. The earlier claims are sufficiently similar to the present one that Rule 9(b) applies. It would make little sense to deny habeas relief based on failure to allow further examinations and grant habeas relief based on the results of those examinations.

Harris's ineffective assistance of counsel claim is clearly barred by Rule 9(b) because it does not raise a "new or different ground for relief." Harris previously raised an ineffective assistance of counsel claim on the ground that his attorney failed to pursue evidence of possible brain damage. We denied that claim in *Harris II.* 885 F.2d at 1367–68.

■ Even if new and different grounds are alleged in a second or successive habeas petition, the petition may also be dismissed if the failure to assert those grounds earlier constitutes "an abuse of the writ." 28 U.S.C. § 2254 foll. Rule 9(b) (1988). The Supreme Court recently clarified the standard federal courts should apply in determining whether a claim constitutes an abuse of the writ. *See McCleskey v. Zant,* ── U.S. ──, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991). In *McCleskey,* the Court held that the State is not required to show that a habeas petitioner's failure to raise a subsequent habeas claim stemmed from a deliberate choice by the petitioner; an abuse of the writ may be found where the failure to raise the claim in an earlier petition was through the petitioner's inexcusable neglect. *Id.* 111 S.Ct. at 1468. The standard used to determine inexcusable neglect in failing to raise a habeas claim in an earlier petition is governed by the same standards used to determine whether to excuse a petitioner's state procedural default. *Id.*

This standard requires the petitioner, once the government satisfies its initial burden of pleading an abuse of the writ, to show cause for failing to raise the claim earlier and "actual prejudice resulting from the errors of which he complains." *Id.* at 1470 (internal quotations omitted). Finally, where the petitioner does not show cause for failing to present the claim earlier, the petitioner does not abuse the writ if he or she can show that a fundamental miscarriage of justice, such as where "a constitutional violation probably has caused the conviction of one innocent of the crime,"

would result from a failure to entertain the claim. *Id.*

Harris argues that the standard announced in *McCleskey* cannot be applied to his pending habeas petition under *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). *Teague,* with certain exceptions, prohibits the application of new constitutional rules of criminal procedure to habeas petitions. *Id.* at 310, 109 S.Ct. at 1074–75 (plurality opinion); *see also* discussion *infra* at Part VII. We do not believe the expression of the abuse of the writ standard announced in *McCleskey* creates a new rule precluding its application to pending cases.

"A case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Id.* 109 S.Ct. at 1070. In *Teague,* the Supreme Court found that the requirement, announced in *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), that a jury venire be drawn from a fair cross section of the community, was a "new rule" in light of the Court's prior statement that " '[f]airness in [jury] selection has never been held to require proportional representation of races upon a jury.' " *Teague,* 489 U.S. at 301, 109 S.Ct. at 1070 (quoting *Akins v. Texas,* 325 U.S. 398, 403, 65 S.Ct. 1276, 1279, 89 L.Ed. 1692 (1945)). By contrast, the inexcusable neglect standard set forth in *McCleskey* followed directly from "a review of [the Court's] habeas corpus precedents." 111 S.Ct. at 1468. The Court did not create a new rule but rather "define[d] the doctrine of abuse of the writ with more precision" than before. *Id.* at 1467.

Harris argues application of the inexcusable neglect standard would be unfair because his counsel relied on reasonable, good-faith interpretations of existing Ninth Circuit precedent. Harris relies upon, among other cases, *Deutscher v. Whitley,* 884 F.2d 1152 (9th Cir.1989), *vacated and remanded,* —— U.S. ——, 111 S.Ct. 1678, 114 L.Ed.2d 73 (1991). In *Deutscher,* we held that a successive habeas petition abused the writ if the petitioner made a "conscious decision deliberately to with-

hold" the claim, "is pursuing needless piecemeal litigation," or has brought the claim "only to vex, harass, or delay." *Id.* at 1156 (internal quotations omitted). *Deutscher,* however, was recently vacated by the Supreme Court and remanded to this court "for further consideration in light of *McCleskey.*" *See Angelone v. Deutscher,* —— U.S. ——, 111 S.Ct. 1678, 114 L.Ed.2d 73 (1991). Though we previously held that such an order by the Supreme Court does not necessarily require retroactive application of the case referred to in the order, *see United States v. Givens,* 767 F.2d 574, 578–79 (9th Cir.), *cert. denied,* 474 U.S. 953, 106 S.Ct. 321, 88 L.Ed.2d 304 (1985), the controlling force depends upon whether the case vacated was decided by this circuit or by a sister circuit. In *Givens,* we held that the Supreme Court's order vacating and remanding an Eleventh Circuit decision in light of *Luce v. United States,* 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1985), did not control the retroactive application of *Luce* in this circuit because of the different standards previously applicable in the separate circuits. *Givens,* 767 F.2d at 578–79. Here, however, the order in *Deutscher* vacated and remanded a decision of this court which applied the very standard Harris's counsel claim they relied upon. *Givens* presumes that the case ordered to be considered will be applied to pending cases in the circuit directly affected by the order.

Harris argues next that the district court erroneously denied two discovery motions thereby preventing him from discovering and presenting evidence to show cause for failing to raise the Abshire claim earlier. Specifically, Harris sought information regarding two cases of misconduct involving the San Diego District Attorney's Office in separate cases prior to Harris's arrest and trial. We review the denial of discovery motions for an abuse of discretion. *Jett v. Sunderman,* 840 F.2d 1487, 1491 (9th Cir.1988). The misconduct involved: (1) an *ex parte* communication by members of the District At-

torney's Office,[12] *see In re Hancock,* 67 Cal.App.3d 943, 945, 136 Cal.Rptr. 901 (1977); and (2) actions by investigators in the District Attorney's Office in 1974 which deprived a criminal defendant of his right to counsel, *see People v. Moore,* 57 Cal. App.3d 437, 129 Cal.Rptr. 279 (1976). Harris provides no indication that the conduct described in these cases was connected to the alleged misconduct in his case. We cannot find that the district court's denial of these discovery motions was an abuse of discretion.

■ Next Harris argues that the district court erred in precluding the presentation of evidence regarding the abuse of the writ question. This court's order to conduct the evidentiary hearing stated: "The remand is limited to the receipt of evidence probative of the issues raised in [Harris's] Motion to Remand and the government's Opposition." 928 F.2d 891, 893 (9th Cir.1991). Though the abuse of the writ issue was raised in both of these documents, the language of the order does not *require* that evidence on all issues be presented, merely that evidence on issues beyond the scope of the motion to remand and opposition may not be presented. The order continues, "[t]he court shall determine whether the failure to produce earlier the declarations supporting Harris's Motion constitutes an abuse of the writ of habeas corpus." If the district court could decide, as a matter of law, that the claim (as supported by the new declarations) constitutes an abuse of the writ, evidence on the abuse issue need not be presented. *McCleskey,* 111 S.Ct. at 1470.

The district court considered the abuse of the writ question as to Harris's claims based on the questioning and testimony of Abshire only. As to the Abshire based claims, the district court found that, under *McCleskey,* the failure to present them ear-lier constitutes an abuse of the writ and a violation of Rule 9(b). We review the district court's decision de novo, although "[t]o the extent it is necessary to review findings of fact, the clearly erroneous standard applies." *Norris v. Risley,* 878 F.2d 1178, 1180 (9th Cir.1989). We also consider whether the remaining claims in Harris's habeas petition constitute an abuse of the writ under the standard expressed in *McCleskey.*

In his post-remand brief, Harris aggregates, for the purpose of addressing the abuse of the writ question, his "mental health claims," *i.e.,* the *Ake* claim, newly discovered evidence claim, and the claim based on the testimony of Griswold. Harris also separates the discussion of his Abshire based claims into claims based on the alleged government agency of Abshire at the time he questioned Harris and claims that the testimony of Abshire regarding his plea bargain was materially inaccurate. We find the presentation of each of these claims constitutes an abuse of the writ.

Harris has not demonstrated cause for the failure to present these claims in his earlier habeas petitions. Harris's mental health claims are based upon facts discovered by Harris's counsel after a 1990 investigation concerning Harris's mental condition. Harris argues that cause for his failure to raise the mental health claims in an earlier petition may be the result of the ineffectiveness of his habeas counsel in discovering the factual basis for these claims earlier.[13] Attorney error will constitute cause, however, only when it constitutes an independent sixth amendment violation. *Coleman v. Thompson,* — U.S. —, 111 S.Ct. 2546, 2566–68, 115 L.Ed.2d 640 (1991). A sixth amendment claim will lie only when counsel is constitutionally required. *Id.* 111 S.Ct. at 2566. Because Harris has no

---

**12.** It is not clear whether Harris' prosecutor, Richard Huffman, was involved in the misconduct. Harris describes the miscreants as "colleagues and superiors" of Huffman.

**13.** Harris does not argue that his habeas counsel was ineffective, rather he argues that they *may have* been ineffective and that the facts necessary to determine this issue require the withdrawal of his counsel and an independent inves-tigation of their performance. Harris's appointed counsel have filed motions to withdraw as counsel to permit such an investigation. Because we find that Harris's habeas counsel could not have been constitutionally ineffective as a matter of law, we deny the motion to withdraw in a separate order filed concurrently with this opinion.

constitutional right to counsel in his earlier habeas proceedings, *Pennsylvania v. Finley*, 481 U.S. 551, 555, 107 S.Ct. 1990, 1993, 95 L.Ed.2d 539 (1987), no error by his habeas counsel could constitute a sixth amendment violation or, therefore, cause under the standard expressed in *McCleskey. See McCleskey*, 111 S.Ct. at 1470 ("[a]ttorney error short of [constitutionally] ineffective assistance of counsel ... does not constitute cause"); *United States v. Angelone*, 894 F.2d 1129, 1130 (9th Cir.1990) (petitioner "cannot raise an ineffectiveness of counsel claim because he had no right to counsel on his collateral post-conviction" proceeding).[14]

Harris also makes *no showing of cause* for failure to present his claims based on the questioning and testimony of Abshire. As in procedural default cases, "the cause standard requires the petitioner to show that 'some objective factor external to the defense impeded counsel's efforts' to raise the claim" earlier. *McCleskey*, 111 S.Ct. at 1470 (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986)). In the abuse of the writ context, the

> petitioner must conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief in the first federal habeas petition. If what petitioner knows or could discover upon reasonable investigation supports a claim for relief in a federal habeas petition, what he does not know is irrelevant. Omission of the claim will not be excused merely because evidence discovered later might also have supported or strengthened the claim.

*Id.* 111 S.Ct. at 1472.

■■■ Harris argues that "the government actively concealed Abshire's status as

a government agent." The only support Harris provides for this assertion is the declaration of Abshire attached to Harris's motion to remand and a supplemental memorandum filed before the district court on remand. The supplemental memorandum, however, relies wholly on Abshire's declaration. Abshire's declaration, standing alone, was sufficient to require an evidentiary hearing on the issue of his status as a government agent. *Harris*, 928 F.2d at 893. As discussed in Part XII *infra*, however, we find the district court correctly determined that Abshire was not a government agent at the time he questioned Harris. Because he was not a government agent, the government could not actively conceal his status as an agent. Harris thus provides no credible evidence to require an additional hearing on the abuse of the writ question on this issue. *See McCleskey*, 111 S.Ct. at 1470 (an evidentiary hearing is not required when the court determines as a matter of law that the petitioner cannot satisfy the standard).

Harris also claims that he should be given a hearing on the cause and prejudice standard to determine whether the government concealed the benefits conferred on Abshire in exchange for his testimony. Harris provides no showing of government concealment, however. The district court found, and Harris does not dispute, the information relating to Abshire's plea bargain existed in public records or discovery materials available during or shortly after trial. Because he "could [have] discover[ed] the factual basis for this claim] upon reasonable investigation," his failure to present the claim in an earlier petition constitutes an abuse of the writ. *Id.* at 1472.

---

**14.** The dissent asserts that Harris can show cause to excuse the failure to present earlier his *Ake* claim because the legal basis for this claim was not reasonably available to counsel at the time of the earlier petition. Harris, however, does not dispute that the legal basis for his *Ake* claim was reasonably available at the time his earlier claims were pending before the district court. Because the Supreme Court granted certiorari in *Ake* prior to the district court's consolidation of the unresolved issues in the first and second habeas petitions and additional briefing,

*see Harris v. Pulley*, 885 F.2d 1354, 1359 (9th Cir.1988), Harris concedes that he "could have amended the habeas petitions before the district court at that time." Petitioner's Opening Post-Remand Brief, 10 (citing *Ake v. Oklahoma*, 465 U.S. 1099, 104 S.Ct. 1591, 80 L.Ed.2d 123 (1984)). Indeed, it is the availability of the legal basis for the *Ake* claim which, Harris argues, renders his counsel's failure to discover the factual basis ineffective assistance. *Id.* at 10 & n. 19.

The fact that his habeas counsel did not conduct this reasonable investigation also cannot constitute cause. *Coleman*, 111 S.Ct. at 2566–68, *Angelone*, 894 F.2d at 1130.

Even if the petitioner cannot satisfy the cause and prejudice standard, he may be entitled to habeas relief "if he or she can show that a fundamental miscarriage of justice would result from a failure to entertain the claim." *McCleskey*, 111 S.Ct. at 1470. A fundamental miscarriage of justice occurs in those "extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime." *Id.* Harris argues that the recently obtained psychiatric evaluations of Harris, and the absence of Abshire's allegedly tainted testimony, would allow a jury to find Harris lacked the requisite mental state required to impose the death penalty under California law.

Harris has made no colorable showing of factual innocence as to the guilt stage of his trial. Regardless of whether Abshire was a state agent at the time he questioned Harris, "[t]he alleged *Massiah* violation, if it be one, resulted in the admission at trial of truthful inculpatory evidence which did not affect the reliability of the guilt determination." *McCleskey*, 111 S.Ct. at 1474; *see also Smith v. Murray*, 477 U.S. 527, 538, 106 S.Ct. 2661, 2668, 91 L.Ed.2d 434 (1986) ("the alleged constitutional error neither precluded the development of true facts nor resulted in the admission of false ones").

Harris argues, however, that recent psychological evaluations "conclusively demonstrate[ ] that [he] suffered from severe and chronic mental disabilities and disorders that affected his ability to form the required intent at the time of the offenses." These evaluations do not, however, place this case into the class of extraordinary instances where "the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'" *Murray v. Carrier*, 477 U.S. 478, 495, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986) (quoting *Engle*

*v. Isaac*, 456 U.S. 107, 135, 102 S.Ct. 1558, 1576, 71 L.Ed.2d 783 (1982)); *see also McCleskey*, 111 S.Ct. at 1470, 1474 (miscarriage of justice is a "narrow" exception to finding an abuse of the writ which applies only in "extraordinary instances"). Because "psychiatrists disagree widely and frequently on what constitutes mental illness," *Ake v. Oklahoma*, 470 U.S. 68, 81, 105 S.Ct. 1087, 1095, 84 L.Ed.2d 53 (1985), a defendant could, if Harris's argument were adopted, always provide a showing of factual innocence by hiring psychiatric experts who would reach a favorable conclusion. In light of the record in this case, including Harris's confessions of the murders and his motive, we conclude that his presentation of psychiatric evaluations thirteen years later, without more, does not present a colorable showing of factual innocence.

Harris has also failed to show that the psychological evaluations would render his sentence a miscarriage of justice. The Supreme Court has acknowledged that the concept of factual innocence "does not translate easily into the context of an alleged error at the sentencing phase of a trial on a capital offense." *Smith*, 477 U.S. at 537, 106 S.Ct. at 2668; *see also Dugger v. Adams*, 489 U.S. 401, 412 n. 6, 109 S.Ct. 1211, 1217 n. 6, 103 L.Ed.2d 435 (1989). In *Dugger*, the trial court allegedly erred in instructing the jury regarding its role in sentencing in violation of *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). Such error, the Court held, would not constitute a miscarriage of justice, even when, as in *Dugger*, there was an "equal number of aggravating and mitigating circumstances suggest[ing] that the sentencing decision was a close call." 489 U.S. at 423 n. 14, 109 S.Ct. at 1224 n. 14 (Blackmun, J., dissenting). Even when the petitioner makes a "'substantial claim that [a] constitutional violation undermined the accuracy of the sentencing decision,'" such a claim "is far from demonstrating that an individual defendant probably is 'actually innocent' of the sentence he or she received." *Id.* at 412 n. 6, 109 S.Ct. at 1217 n. 6 (quoting *id.* at 415 n. 4, 109 S.Ct. at 1219 n. 4 (Black-

mun, J., dissenting)). Though *Dugger* declined to define what it means to be "actually innocent" of a death sentence, *id.*, it is clear that the mere presentation of new psychological evaluations, against the factual background in this case, does not constitute a colorable showing of actual innocence of Harris's sentence.

Our determination that Rules 9(a) and 9(b) allow for dismissal of each claim in Harris's third petition for federal habeas corpus relief ordinarily would end our review. We have concluded, however, that the interests of justice will be served if we reach the merits of each of Harris's claims that can be reviewed on habeas corpus, with the hope that all questions concerning the validity of the state court's judgment will finally be resolved after eleven years of writs and appeals. *See* Rules Governing Section 2254 Cases in the United States District Court Rule 9; Advisory Committee Note to Rule 9; *Sanders v. United States,* 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963).

## VI. *Harris's Alleged Ake Claim*

■ Harris argues that he was denied access to a qualified psychiatrist who "conducts professionally competent examinations of the defendant and who on this basis provides professionally competent assistance." Appellant's Brief at 15. Harris contends that access to such psychiatric assistance is required by the due process protection holding in *Ake v. Oklahoma,*

470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Under *Ake,* the state must provide an indigent defendant with *access* to psychiatric assistance at the guilt phase of a trial, when the defendant has demonstrated that his sanity at the time of the offense is likely to be a significant factor in determining guilt. *Id.* at 83, 105 S.Ct. at 1096.

■ Harris's *Ake* claim to psychiatric assistance at the guilt phase fails because the state did in fact provide Harris with psychiatric assistance. The state provided Harris with *access* to any competent psychiatrist of his choice when it gave Harris the funds to hire two psychiatrists from the general psychiatric community. The state did not limit Harris's access to psychiatric assistance in any way.[15] Indeed, the state went beyond the requirements of *Ake* by allowing Harris to choose his own psychiatrist, rather than appointing a state-chosen psychiatrist. *See Ake,* 470 U.S. at 83, 105 S.Ct. at 1096 (indigent defendant does not have a constitutional right to receive funds to hire the psychiatrist of his choice). Further, *Ake* does not guarantee access to a psychiatrist "who will reach only biased or favorable conclusions." *Granviel v. Lynaugh,* 881 F.2d 185, 192 (5th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 2577, 109 L.Ed.2d 758 (1990).

■ Harris also asserts that he had a right to state-funded psychiatric assistance to respond to Dr. Griswold's penalty phase testimony.[16] Without deciding if Harris

---

**15.** Defense counsel selected and retained Harris's two psychiatrists. Petition, Exhibit F p. 1; District Court Order pp. 5–6. The state provided the funds not the psychiatrists. District Court Order pp. 5–6. Harris has not alleged any facts showing that funding was insufficient to hire a competent psychiatrist.

**16.** Dr. Griswold's testimony at the penalty phase was introduced to rebut Harris's claims that he felt remorse and had attempted to commit suicide. The prosecution relied on the jury's findings of the felony-murder and multiple murder special circumstance, which would allow the death penalty under California law and also called several lay witnesses to testify as to Harris's violent behavior while in prison and Harris's prior crimes. These included a 1975 manslaughter conviction wherein Harris at the scene admitted beating the victim Wheeler to

death allegedly to protect the victim's wife from harm. Later, like this case, Harris repudiated his confession and claimed his brother Ken had killed Wheeler and that he confessed to protect Ken. Witnesses testified that Harris beat Wheeler to death without provocation while mockingly claiming to teach the victim self-defense and that during the attack Harris cut off Wheeler's hair and threw matches at him after squirting him with lighter fluid. Harris threatened to kill his former wife if she did not support his story. Harris also led a group of inmates who, with Harris, sodomized another inmate and forced the same inmate to orally copulate with Harris and another inmate. The assaults were reported and Harris, in the presence of guards, repeatedly threatened the assaulted inmate's life. Six days later a garrote was found in Harris's cell.

had such a right, clearly he was not denied access to psychiatric assistance at the penalty phase.[17] Harris's selected psychiatrists were available to assist in the preparation of Ryan's defense strategy at the penalty phase. In Ryan's declaration, he admits that the defense psychiatrists had all available materials relating to Harris's background, and that the psychiatrists interviewed and evaluated Harris. Ryan obviously had access to his psychiatrists and consulted them in the preparation for his impressive cross-examination of Dr. Griswold. Ryan asked Griswold pointed, educated questions regarding the causes of an anti-social personality, specifically how the disorder can stem from childhood abuse such as that suffered by Harris. Ryan knew that "antisocial personality" was the term used in the DSM manual and that the word "sociopath" is not generally accepted in the psychiatric community.

During his cross-examination of Dr. Griswold, Ryan stated that he planned to consult his psychiatrists further before concluding his cross-examination of Dr. Griswold. At that time, he was considering calling his psychiatrists to testify, but "[hadn't] decided yet." Ryan chose not to use the 1971 abnormal EEG as part of his case at the guilt phase; his decision not to call a psychiatrist at the penalty phase appears to have been part of Ryan's strategy that focused on proving Harris's lack of premeditation, Harris's horrible childhood, and Harris's remorse for the murders.[18]

Our conclusion that Harris has not presented a violation of *Ake* is supported by the reasoning of the Seventh Circuit. In *Silagy v. Peters*, 905 F.2d 986 (7th Cir. 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1024, 112 L.Ed.2d 1106 (1991), the Seventh Circuit ruled that a claim similar to Harris's did not raise an *Ake* violation. In *Silagy*, a state prisoner argued in his habeas petition that he was denied his fourteenth amendment right to due process in that his trial psychiatrists were "incompetent" in their examinations and diagnoses. The Seventh Circuit held:

[W]e would be reluctant to open up this type of *Ake* claim to a battle of the experts in a "competence" review. Every aspect of a criminal case which involves the testimony of experts could conceivably be subject to such a review—a never ending process.... *A conclusion to the contrary would require this court and other federal courts to engage in a form of "psychiatric medical malpractice" review as part-and-parcel of its collateral review of state court judgments. The ultimate result would be a never-ending battle of psychiatrists appointed as experts for the sole purpose of discrediting a prior psychiatrist's diagnosis.* We do not believe this was the intent of the Court in *Ake* when it held that indigent defendants who raise a defense of insanity are entitled to

---

17. *Smith v. McCormick*, 914 F.2d 1153 (9th Cir. 1990), is not in conflict. In *Smith*, a Montana trial court, in response to defendant's request for a court-appointed psychiatrist, ordered a psychiatric evaluation of the defendant which would be reported directly to the court. "The psychiatrist's contact with Smith was limited to the court-ordered examination. Smith's counsel never met with the psychiatrist to discuss the evaluation or to otherwise assess possible mitigating circumstances." *Id.* at 1158. The *Smith* court held that "under *Ake*, evaluation by a 'neutral' court psychiatrist does not satisfy due process." *Id.* at 1158–59. By contrast, the independence and confidentiality of Harris's psychiatrists are not at issue.

18. Ryan's defense task was a formidable one because before he was appointed Harris, properly "Mirandized," had confessed at least four times and had been interviewed by Dr. Gris-

wold. He quite appropriately hired two psychiatrists to assist him in the defense. Harris responded by confessing to the jury that he had lied during the guilt phase and Ryan went to remorse and an abusive childhood to try to avoid a death sentence. Under these circumstances, Ryan's decision not to call his psychiatrist could reflect a reasonable determination that possible mitigation in the form of psychiatric testimony may have been outweighed by the threat of cross-examination and a confusing battle of psychiatrists and would possibly conflict with Harris's defense of remorse. Harris cannot now obtain a "second bite at the apple" because he believes a new group of psychiatrists would offer a different defense than the psychiatrists originally chosen by Ryan, or that because the defense of remorse did not work with the jury the first time, a battle of experts might work at another trial.

psychiatric assistance in the preparation of their defense.

*Id.* at 1013 (emphasis added). We agree with the Seventh Circuit's interpretation of *Ake.* Allowing such battles of psychiatric opinions during successive collateral challenges to a death sentence would place federal courts in a psycho-legal quagmire resulting in the total abuse of the habeas process.

For the above reasons, Harris has not alleged facts that would support his claim of an *Ake* violation, and Harris is not entitled to an evidentiary hearing based on *Ake. See Harris v. Pulley,* 692 F.2d 1189 at 1197 (9th Cir.1982) ("Harris I") (to obtain evidentiary hearing, habeas petitioner must allege facts which, if proved, would entitle him to relief). Rather, Harris asks this court to apply a constitutional rule that would require federal courts to conduct a "psychiatric medical malpractice review" in a federal habeas proceeding to determine whether a state prisoner's psychiatrists "competently" assisted the defense.

## VII. *Teague New Constitutional Rule*

■ Under *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (plurality opinion), a "new rule" of constitutional law cannot be announced or applied on collateral review unless the rule falls within two narrow exceptions. *Teague*'s limitations on federal habeas corpus review applies to claims concerning the constitutionality of the imposition of the death penalty. *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989). Thus, as a preliminary matter, we must determine whether the constitutional rule Harris asks us to apply would be a "new rule" under *Teague.*

A decision announces a new rule "if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Id.* at 314, 109 S.Ct. at 1077 (quoting *Teague,* 489 U.S. at 301, 109 S.Ct. at 1070 (emphasis in original)). The relevant inquiry is "whether a state court considering [petitioner's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [petitioner] seeks was required by the Constitution." *Saffle v. Parks,* 494 U.S. 484, 110 S.Ct. 1257, 1260, 108 L.Ed.2d 415 (1990).

Harris's conviction became final on October 5, 1981, when the United States Supreme Court denied certiorari. *Harris v. California,* 454 U.S. 882, 102 S.Ct. 365, 70 L.Ed.2d 192 (1981). *Ake* was decided nearly four years later, on February 26, 1985, and only then established the rule of access to psychiatric assistance. Up to that time, without *Ake,* a state court had no reason to conclude that a criminal defendant had a constitutional right to state-funded psychiatric assistance at any stage of a criminal proceeding. The rule Harris asks us to apply—that the competence of defendant-selected psychiatric assistance may be tested by subsequent review of its substance in a federal habeas corpus proceeding—is not dictated by *Ake,* let alone by precedent existing at the time his conviction became final.

■ Harris has directed our attention to a series of cases decided by the Florida Supreme Court since 1986. Florida's highest court has ruled that in death penalty cases, " 'a new sentencing hearing is mandated in cases which entail psychiatric examinations so grossly insufficient that they ignore clear indications of either mental retardation or organic brain damage.' " *State v. Sireci,* 536 So.2d 231, 232 (Fla. 1988) (quoting *State v. Sireci,* 502 So.2d 1221, 1224 (Fla.1987) (citing *Mason v. State,* 489 So.2d 734, 736 (Fla.1986))). A "competent assistance of experts" claim is brought in a motion for post-conviction relief pursuant to Florida Rule of Criminal Procedure 3.850. *Mason v. State,* 489 So.2d at 735. These cases created a "new rule" applicable in the state of Florida several years after Harris's direct appeal became final in 1981. Thus, under *Teague,* we would be barred from applying the Florida rule even if we found it persuasive. Because *Teague* applies solely to *federal* habeas corpus petitions filed by state prisoners, the Florida Supreme Court is, of course, not bound by *Teague.* Unlike the Florida Supreme Court, we must consider

"interests of comity and finality ... in determining the proper scope of habeas review." *Teague,* 489 U.S. at 308, 109 S.Ct. at 1073.

The "new rule" limitation on habeas review by federal courts "validates reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions." *Butler v. McKellar,* 494 U.S. 407, 110 S.Ct. 1212, 1217, 108 L.Ed.2d 347 (1990). The "new rule" limitation "serves to ensure that gradual developments in the law over which reasonable jurists may disagree are not later used to upset the finality of state convictions valid when entered." *Sawyer v. Smith,* — U.S. ——, 110 S.Ct. 2822, 2827, 111 L.Ed.2d 193 (1990). The "new rule" limitation recognizes that the purpose of federal habeas corpus is "not to provide a mechanism for the continuing reexamination of final judgments based upon later emerging legal doctrine." *Id.* In this case, where neither *Ake* nor precedents existing at the time of Harris's conviction require collateral review of the substance of psychiatric testimony or assistance where the state has not limited the defendant's access to such assistance, Harris's claim is based on a new rule.

▬ Having decided that Harris's claim rests on a new rule of constitutional law, we must decide whether it fits within either of the exceptions recognized in *Teague.* The first exception to *Teague* permits retroactive application of a new rule that places a class of private conduct beyond the state's power to prohibit or addresses a substantive categorical constitutional guarantee, such as a rule prohibiting a certain category of punishment. *Saffle,* 110 S.Ct. at 1263. This exception is clearly inapplicable.

▬ The second *Teague* exception is for "watershed rules of criminal procedure" that implicate the fundamental fairness and accuracy of the criminal proceeding. *Saffle,* 110 S.Ct. at 1263–64. Harris contends that his proposed rule requiring collateral judicial review of the competence of defense psychiatrists falls within this exception.

Harris argues that his proposed rule falls within the second *Teague* exception because *Ake* is grounded in part on "the Fourteenth Amendment's guarantee of fundamental fairness." *Ake,* 470 U.S. at 76, 105 S.Ct. at 1092. As we indicated above, however, Harris has not made out an *Ake* claim, and we therefore do not decide *Ake*'s retroactivity but the retroactivity of the new rule proposed by Harris. Moreover, the fact that a rule is grounded in part on the due process clause does not mean that it automatically falls within the "watershed rule" exception.[19] Rather, the "precise contours" of the exception are

**19.** In determining whether to apply a new rule retroactively on collateral review, it is important to remember that the focus is on the purposes for which the writ of habeas corpus is made available, *not* the purpose of the rule whose benefit the petitioner seeks. *Teague,* 489 U.S. at 306, 109 S.Ct. at 1072–73 (quoting *Mackey v. United States,* 401 U.S. 667, 682, 91 S.Ct. 1160, 1174–75, 28 L.Ed.2d 404 (1971) (separate opinion of Harlan, J.)). In fact, it is the availability of collateral review that creates the retroactivity problem in the first place. *See Id.* 489 U.S. at 309–10, 109 S.Ct. at 1075–76; Mishkin, *Foreword: the High Court, the Great Writ, and the Due Process of Time and Law,* 79 Harv. L.Rev. 56, 77–78 (1965).

The scope of the writ is not defined " 'simply by reference to a perceived need to assure that an individual accused of a crime is afforded a trial free of constitutional error.' " *Teague,* 489 U.S. at 308, 109 S.Ct. at 1073, (quoting *Kuhlmann v. Wilson,* 477 U.S. 436, 447, 106 S.Ct.

2616, 2623, 91 L.Ed.2d 364 (1986) (plurality opinion). Rather, as *Teague* states, the major purpose of habeas review is to provide an incentive for state judges to conduct proceedings in accordance with established constitutional principles. *Teague,* 489 U.S. at 306, 109 S.Ct. at 1072.

To illustrate this point, *Teague* notes that "if a defendant fails to comply with state procedural rules and is barred from litigating a particular constitutional claim in state court, the claim can be considered on federal habeas only if the defendant shows cause for the default and actual prejudice resulting therefrom." *Id.; see also Wainwright v. Sykes,* 433 U.S. 72, 87–91, 97 S.Ct. 2497, 2506–09, 53 L.Ed.2d 594 (1977); *cf. McCleskey v. Zant,* 111 S.Ct. 1454, 1468 (cause and prejudice standard applies in abuse of the writ context). This procedural bar is not dependent on the magnitude of the constitutional claim at issue. *Engle v. Isaac,* 456 U.S. 107, 129, 102 S.Ct. 1558, 1572, 71 L.Ed.2d 783 (1982).

"difficult to discern." *Saffle*, 110 S.Ct. at 1264.

As an example of the type of rule requiring retroactive application on collateral review, *Saffle* cites the right of indigent defendants to counsel under *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). *Saffle*, 110 S.Ct. at 1264. According to *Teague*, "such rules are 'best illustrated by recalling the classic grounds for the issuance of a writ of habeas corpus—that the proceeding was dominated by mob violence; that the prosecutor knowingly made use of perjured testimony; or that the conviction was based on a confession extorted from the defendant by brutal methods.'" *Teague*, 489 U.S. at 313, 109 S.Ct. at 1077 (quoting *Rose v. Lundy*, 455 U.S. 509, 544, 102 S.Ct. 1198, 1216–17, 71 L.Ed.2d 379 (1982) (Stevens, J., dissenting)). The rule Harris asks us to apply is not the kind of "absolute prerequisite to fundamental fairness," *id.* 489 U.S. at 314, 109 S.Ct. at 1077, that is illustrated by the above examples. It is not a "watershed rule" that would require retroactive application to ensure fundamental fairness.[20]

The Supreme Court has stated that the "watershed rule" exception should be limited " 'to those procedures without which the likelihood of an accurate conviction is seriously diminished.'" *Butler*, 110 S.Ct. at 1218 (quoting *Teague*, 489 U.S. at 313, 109 S.Ct. at 1077). It is "not enough under *Teague* to say that a new rule is aimed at improving the accuracy of trial. More is required ... The second exception is directed only at new rules *essential* to the accuracy and fairness of the criminal process." *Sawyer*, 110 S.Ct. at 2831 (emphasis added).

A judicial evaluation of a psychiatrist's opinion or advice is not essential to the accuracy and fairness of the criminal process. The availability of such a judicial evaluation in a federal habeas proceeding would allow a defendant who has been given access to competent psychiatric assistance under *Ake* to establish a constitutional infirmity to his death penalty through the opinions of new psychiatrists who, eleven years later, offer different opinions. Although we recognize that a defendant's *access* to a competent psychiatrist might increase the likelihood of an accurate conviction, we are not persuaded that collateral "psychiatric medical malpractice" review of the opinions of defense psychiatrists freely selected by the defendant or his counsel serves the same goal. As noted above, there is no record of the findings and evaluations of the psychiatrists who assisted Harris's attorney at trial. Nevertheless, Harris asks this court to hold a hearing to test the quality of their assistance against the hindsight opinions of psychiatrists who claim that Harris received incompetent advice. Allowing a defendant to search for a new psychiatrist whose opinion might undermine the psychiatric assistance received by defendant at trial does little to further the objectives of fairness and accuracy in criminal proceedings.

Harris's claims in this petition provide an excellent example of how the principle Harris asks this court to adopt would frustrate

---

**20.** *Teague*'s limitation on the retroactive application of constitutional rules is grounded on the interests of comity and finality of state judgments. *Teague*, 489 U.S. at 308, 109 S.Ct. at 1073–74. As *Teague* makes clear, "the application of new rules to cases on collateral review may be more intrusive than the enjoining of criminal prosecutions, *cf. Younger v. Harris*, 401 U.S. 37, 43–54, 91 S.Ct. 746, 750–55, 27 L.Ed.2d 669 (1971), for it *continually* forces the states to marshal resources in order to keep in prison defendants whose trials and appeals conformed to then-existing constitutional standards." *Teague*, 489 U.S. at 310, 109 S.Ct. at 1075 (emphasis in original). "State courts are understandably frustrated when they faithfully apply existing constitutional law only to have a federal court discover, during a [habeas] proceeding, new constitutional commands." *Id.* (quoting *Engle v. Isaac*, 456 U.S. 107, 128 n. 33, 102 S.Ct. 1558, 1572 n. 33, 71 L.Ed.2d 783 (1982)).

These concerns are especially pertinent to the present case. The state has been unable to carry out Harris's sentence for more than eleven years, during which time it has marshaled its resources to respond to two prior federal habeas petitions that resulted in a number of appellate proceedings. Harris's current petition is based on a novel and extremely broad interpretation of a case decided six years after Harris's conviction.

the legitimate goals of the criminal justice system, rather than enhance its accuracy. Harris has submitted no evidence that his trial psychiatrists were unlicensed, inexperienced, or unqualified. He offers only declarations of experts who, eleven years after trial, are prepared to testify that, in their opinion, Harris received incompetent advice and assistance without having seen any report of their examination or questioned them about their conclusions. The Supreme Court has cautioned that psychiatry is "not ... an exact science, and psychiatrists disagree widely and frequently." [21] *Ake,* 470 U.S. at 81, 105 S.Ct. at 1095.

Harris relies heavily on the declaration of Dr. James Missett, a psychiatrist and faculty member at Stanford University Medical Center in his attempt to prove that the psychiatrists who assisted in the defense at trial furnished incompetent advice. Dr. Missett was retained to review and examine various documents relating to the psychiatric evaluations and examinations that were conducted of Harris following his arrest and to form and express an opinion as to whether the efforts of the appointed psychiatrists met the "applicable" standard of care for such evaluations in capital cases.

Dr. Missett stated that, in reviewing the work of another psychiatrist, he would ordinarily review any available notes or documents and discuss with the psychiatrist those facts or observations which he felt to be significant in his reasoning process. Because he understood that neither of Harris's defense psychiatrists were available for interview, and neither prepared a written report, he was compelled to rely on the information contained in the declaration of attorney Thomas Ryan "as representing the sum of the available information regarding the efforts undertaken by the psychiatrists retained for the defense." [22] In his declaration, dated March 9, 1990, Dr.

**21.** The American Psychiatric Association acknowledges the evolving and inexact nature of the psychiatric discipline. In the introduction to DSM–III, the association cautions that the volume is "only one still frame in the ongoing process of attempting to better understand mental disorders." DSM–III at 12. DSM–III–R acknowledges that it "represents another still frame." DSM–III–R at xvii. In fact, the American Psychiatric Association chose to revise DSM–III because new experimental data was "inconsistent with some of the diagnostic criteria" of DSM–III and experience since publication revealed "many instances in which the criteria were not entirely clear, were inconsistent across categories, or were even contradictory." *Id.* DSM–III–R cautions that its mental disorder classifications "reflect a consensus of current formulations of *evolving knowledge*" in the field of psychiatry. DSM–III–R at xxiv (emphasis added). One of the inconsistencies in DSM–II, III, and III–R is the ability of antisocial persons to feel remorse or to learn from experience. With regard to an antisocial person's ability to feel remorse or learn from punishment, DSM–II, on which Dr. Griswold relied, states that such persons are "unable to feel guilt or to learn from experience or punishment." DSM–II at 43. DSM–III does not address the issue. DSM–III–R states that people with Antisocial Personality Disorder "generally have no remorse about the effects of their behavior on others; they may even feel justified in having hurt or mistreated others." DSM–III–R at 342.

**22.** It should be noted again that Harris, not the state, is in complete control of whatever documentation exists showing what information his psychiatrists reviewed. Harris's counsel's consultations with the psychiatrists are protected by the cloak of confidentiality. Harris fails to offer any evidence of what advice or opinions his two doctors gave. All we have in this record is Ryan's conclusory declaration, which includes the nebulous statements that the doctors were not "helpful" and to Ryan's "knowledge" what records or materials the defense psychiatrists had or what efforts they took. Ryan's knowledge as stated in his declaration is not the equivalent of the work of the two psychiatrists and is a faulty basis for Dr. Missett's "malpractice" conclusion. We do know Ryan knew of Harris's 1971 abnormal EEG and decided not to use such evidence. We also know that the records turned over to the defense psychiatrist contained evidence of organic brain damage. The doctors could have given opinions and advice regarding psychiatric theory that was not "helpful" because in Ryan's opinion it would not free Harris, or the advice may have caused their testimony to be subjected to cross-examination on a collateral issue in the defense's mitigation presentation—all of which counsel could have deemed not "helpful" in his assessment of the case he was presenting to the jury—pure trial strategy. But we do not know because it remains confidential and unstated. Ryan's statement in his declaration that he did not have information from any source *whatsoever* that Harris suffered from organic brain syndrome is in conflict with his decision not to use the 1971 abnormal EEG.

Missett reached the conclusion that Harris's trial psychiatrists "failed to meet the standard of care ordinarily expected of psychiatrists in death penalty evaluations" by failing to perform "minimal diagnostic and investigatory exercises" required under the circumstances. Petition, Exhibit H, p. 6. Dr. Missett's opinion, however, is based on pure speculation as to what "diagnostic and investigatory exercises" the trial psychiatrists actually performed. Dr. Missett is simply ignorant of the material that was reviewed by Drs. Read and Rodgers, or the evaluation made of Harris's mental condition.

In Ryan's declaration, Ryan states only that he "provided the doctors with materials related to the offenses, including the police reports and the Dr. Griswold report." In fact, Ryan "provided [the defense psychiatrists] with as much material as [he] had as to Mr. Harris's background."

Because the opinions of Harris's current experts concerning the competency of the assistance rendered by his trial psychiatrists are based on pure speculation, these opinions are not probative of the fundamental fairness of Harris's trial or of the competency of the evaluations performed by Harris's trial psychiatrists. By submitting these speculations of his new psychiatric advisors, Harris merely invites this court to preside over a malpractice debate based on a hypothetical set of facts. Such a proceeding would not enhance the accuracy of the fact finding process, and is hardly the stuff of which watershed rules are made.

The fact that Harris has found psychiatrists whose opinions may differ from those of his trial psychiatrists is not surprising. Differences in psychiatric opinions are evidence to be presented to the jury, which ultimately chooses among the opinions in finding the facts. Psychiatric opinions are not legal precedent that determine the guilt or innocence of the defendant. They do not provide a sufficient evidentiary basis to require an evidentiary hearing in a third federal habeas corpus petition, especially when the defense has not provided any evidence indicating what the trial psychiatrists actually reviewed, or what the exact nature of their assistance was, or what their opinions were regarding Harris's mental state or condition.

"Whatever one may think of the importance of [Harris's] proposed rule, it has none of the primacy and centrality of the rule adopted in *Gideon* or other rules which may be thought to be within the [watershed rule] exception." *Saffle*, 110 S.Ct. at 1264. Because Harris's proposed constitutional requirement does not represent a "watershed rule," we are precluded by *Teague* from adopting it in this federal habeas corpus proceeding.

## VIII. *Effective Assistance of A Psychiatric Expert Under California Law*

 As the Supreme Court has stated, a "[l]iberty interest protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause and the laws of the States." *Hewitt v. Helms*, 459 U.S. 460, 466, 103 S.Ct. 864, 868–69, 74 L.Ed.2d 675 (1983). When a state uses mandatory language in its enactment of a statutory measure, the state creates a protected liberty interest. *Id.* at 471–72, 103 S.Ct. at 871–72; *Hicks v. Oklahoma*, 447 U.S. 343, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980). Harris contends that California has created a right to effective assistance of psychiatric experts under Cal.Penal Code § 987.9. We disagree.

 Under California law, a defendant in a capital case is guaranteed ancillary services necessary to the preparation of a defense, including expert witnesses. *Corenevsky v. Superior Court*, 36 Cal.3d 307, 319, 204 Cal.Rptr. 165, 171, 682 P.2d 360, 366 (1984); *Keenan v. Superior Court*, 31 Cal.3d 424, 180 Cal.Rptr. 489, 491, 640 P.2d 108, 109–10 (1982); *In re Ketchel*, 68 Cal.2d 397, 399, 66 Cal.Rptr. 881, 883, 438 P.2d 625, 627 (1968). This right is codified in Cal.Penal Code § 987.9, which provides in pertinent part:

> In the trial of a capital case ... the indigent defendant, through the defendant's counsel, may request the court for funds for the specific payment of investigators, experts, and others for the prepa-

ration or presentation of the defense. The application for funds shall be by affidavit and shall specify that the funds are reasonably necessary for the preparation or presentation of the defense. The fact that an application has been made shall be confidential and the contents of the application shall be confidential. Upon receipt of an application, a judge of the court, other than the trial judge presiding over the case in question, shall rule on the reasonableness of the request and shall disburse an appropriate amount of money to the defendant's attorney. The ruling on the reasonableness of the request shall be made at an in camera hearing. In making the ruling, the court shall be guided by the need to provide a complete and full defense for the defendant.

Cal.Penal Code § 987.9 (1985 & Supp. 1990). Section 987.9 thus provides a defendant in a capital case with an avenue to petition for state funds with which to pay a psychiatrist of his own choosing. *Cf. Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) (state must provide *access* to a psychiatrist in capital cases). California enacted Cal.Penal Code § 987.9 in 1977, anticipating the right to access to a psychiatric expert provided in *Ake v. Oklahoma*. Section 987.9, however, does not provide for collateral judicial review of the competency of defense psychiatrists or validity of the expert's confidential report. *See* Cal.Evid.Code § 1017(a) (the report of a psychiatrist is privileged if appointed by the court to advise the defendant in a criminal proceeding).

We ruled in *Harris II* that the trial court did not err in denying funds for an additional EEG. *Harris II*, 885 F.2d at 1368. Harris's application for funds to hire psychiatrists was granted in the state court. Thus, whatever due process productions are provided by section 987.9 were fulfilled. Harris cannot seek relief in his habeas petition on this ground.

## IX. *Newly Discovered Evidence*

Harris argues that, if neither his trial counsel nor his psychiatrists were incompetent, then the evidence of brain damage is newly discovered evidence that would have provided a defense to the charged crimes and special circumstances, as well as essential mitigating evidence at the penalty hearing. Harris cites no authority for his proposition except *Quigg v. Crist*, and in his Petition he bases his claim on the new psychiatric opinions discussed earlier and on the fact that the state denied his request for funds for a new EEG—a claim we rejected in *Harris II*.

Newly discovered evidence warrants federal habeas corpus relief if it would "probably produce an acquittal." *Quigg v. Crist*, 616 F.2d 1107, 1112 (9th Cir.), *cert. denied*, 449 U.S. 922, 101 S.Ct. 323, 66 L.Ed.2d 150 (1980). However, Harris has not alleged that the alleged brain disorders were unknown to the psychiatric community at the time of trial or that Harris's trial psychiatrists failed to consider these disorders in diagnosing Harris. Harris's counsel and the defense psychiatrists had evidence of organic brain damage from the 1971 abnormal EEG, and all of the family, medical and prison information and background that is now used by the new psychiatrists. Thus, Harris has not offered any "new evidence." He offers only opinions from new psychiatrists, which are not new facts requiring relief under *Quigg*.

Furthermore, Harris has not demonstrated that his "new evidence" would probably produce an acquittal, or even that it would probably result in a penalty other than the death penalty. The new testimony does not show that Harris did not commit the murders and does not establish any legal defense to murder. The new testimony does not refute the special circumstances findings of double murder and felony murder and does not establish any legal obstacle to imposition of the death penalty. The new testimony might undermine Harris's claims of remorse. Harris's abuse as a child was already presented to the jury. In his well-organized cross-examination of Dr. Griswold, Ryan established that Harris's mental disorders were probably the result of the abuse Harris suffered as a child. For these reasons, one cannot say that the new psychiatric opinions, if intro-

duced at trial, probably would have changed the jury's verdict. Thus, the district court properly held that Harris was not prejudiced, under *Quigg*, by his counsel's failure to introduce this type of testimony for the jury's consideration.

## X. *False Testimony*

■ Harris argues that Dr. Griswold's diagnosis of antisocial personality was the product of an inadequate and unprofessional psychiatric evaluation. This argument is basically a "malpractice" argument, which we have already rejected and, as we have fully discussed above, is merely a disagreement in expert opinion. Harris further argues that Dr. Griswold falsely testified at the penalty phase that Harris was beyond rehabilitation and was incapable of feeling remorse. Harris has mischaracterized Griswold's testimony and has not demonstrated that any of Griswold's testimony was false.

Contrary to Harris's assertions, Dr. Griswold never testified that Harris, or sociopaths generally, are beyond rehabilitation. Rather, Dr. Griswold testified that sociopaths seem to have difficulty learning from experience or punishment. This testimony is supported by DSM–II, DSM–III–R, and the declarations of Dr. J. Reid Meloy.

Dr. Griswold also testified that he would not ordinarily expect a sociopath to feel remorse. During cross-examination, Dr. Griswold testified that "it is possible, but … not likely" for an antisocial person to feel remorse. Dr. Griswold testified further that the general characteristics of an antisocial personality will not be found in every antisocial person. Harris has not presented any evidence showing that any of these statements are materially inaccurate.

To support his assertion that Dr. Griswold testified falsely, Harris submits opinions from other psychiatrists that differ, in some respects, from Dr. Griswold's opinion. However, none of these psychiatrists states that Harris did not fit the description of an antisocial personality, or that Harris would not have difficulty learning from punishment. At most, they may support a paral-

lel theory and opinion to explain Harris's actions, but they do not provide evidence that Dr. Griswold's theory was wrong. Moreover, these conflicting psychiatric opinions do not show that Dr. Griswold's testimony was false; "psychiatrists disagree widely and frequently." *Ake*, 470 U.S. at 81, 105 S.Ct. at 1095.

An examination of DSM–II, DSM–III, and DSM–III–R demonstrates that the different diagnoses may be the product of the evolution of the inexact science of psychiatry. With regard to an antisocial person's ability to feel remorse or learn from punishment, DSM–II, on which Dr. Griswold relied, states that such persons are "unable to feel guilt or to learn from experience or punishment." DSM–II at 43. DSM–III does not address the issue. DSM–III–R states that people with Antisocial Personality Disorder "generally have no remorse about the effects of their behavior on others; they may even feel justified in having hurt or mistreated others." DSM–III–R at 342. Dr. Griswold's testimony is clearly consistent with DSM–II, and does not conflict with DSM–III–R.

In conclusion, the jury was not presented with evidence that Harris was categorically impossible to rehabilitate. Harris has offered new psychiatric opinions that are not entirely consistent with Dr. Griswold's testimony, but he has not shown that any of Dr. Griswold's statements were "false" or "materially inaccurate." Harris has failed to demonstrate that Dr. Griswold's testimony supports his claim of a violation of due process or that he has been subjected to cruel and unusual punishment.

## XI. *Ineffective Assistance of Counsel*

■ In the district court, Harris raised an ineffective assistance of counsel claim. Harris has not presented any argument that the district court incorrectly ruled on this issue, but he attempts to preserve the issue in footnote 37 of his brief.

Harris's ineffective assistance of counsel claim fails the two-pronged test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which requires both a showing of deficient per-

formance and a showing of actual prejudice. Harris has not shown that defense counsel's conduct was not within the "wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. at 2066.

It is certainly within the "wide range of professionally competent assistance" for an attorney to rely on properly selected experts. Harris has not alleged any facts showing that Ryan should not have chosen the two psychiatrists who assisted the defense, or that Ryan had any reason to believe the defense psychiatrists were incompetent, or that their credentials were deficient in any way. As we have stated above, there is no evidence in the record regarding the two defense psychiatrists work or opinions other than Ryan's conclusory, self-serving declaration. It does not indicate that Ryan, untrained in psychiatry, questioned or should have questioned the competence of the psychiatrists or should have chosen a different defense at the guilt or penalty phase. In fact the record in this case clearly indicates that Ryan, in a very difficult defense case, had access to his chosen psychiatrists and, even at the time of his cross examination of Dr. Griswold at the penalty trial, was still considering using psychiatric testimony.

It was clearly within the "wide range of professionally competent assistance" for Ryan to choose not to present a psychiatric defense theory that could conflict with his alibi defense and his mitigation based on Harris's alleged remorse and his abusive childhood. It is also acceptable trial strategy to choose not to call psychiatrists to testify when they can be subjected to cross-examination based on equally persuasive psychiatric opinions that reach a different conclusion. *See, supra,* note 14.

Harris relies on *Deutscher v. Whitley,* 884 F.2d 1152 (9th Cir.1989), *vacated and remanded on other grounds,* —— U.S. ——, 111 S.Ct. 1678, 114 L.Ed.2d 73 (1991), where we held that a defense counsel's failure to investigate the defendant's mental state was ineffective assistance of counsel. In resolving Deutscher's ineffective assistance of counsel claim, we noted that Deutscher had a documented history of "schizophrenia, pathological intoxication, organic brain damage, and commitments to mental institutions." *Id.* at 1161. Defense counsel failed to produce any evidence of the extreme abuse Deutscher suffered as a child. *Id.* at 1161. In fact, defense counsel "failed to present any mitigation evidence at all," relying solely on the argument that the murder was so brutal that it must have been the product of a diseased mind. *Id.* at 1154, 1161.

In contrast, Harris's trial counsel consulted two independent psychiatrists, on a confidential basis, to investigate the mental defenses of insanity and diminished capacity and to provide mitigating evidence at the penalty phase. Ryan informed the court he was considering introducing psychiatric testimony at the penalty hearing, but chose not to call them.

Additionally, the alleged errors complained of by Harris fall far short of the standard of prejudice established by *Deutscher.* Ryan produced substantial mitigating evidence at the penalty phase of Harris's trial. He demonstrated that Harris was subjected to extreme abuse as a child through the testimony of Harris's mother and sister. Dr. Griswold testified that Harris suffered from an anti-social personality disorder. In Ryan's cross-examination of Griswold, Ryan established that Harris's antisocial personality disorder probably resulted from his being abused as a child. Ryan further explored Harris's background, bringing forth evidence of Harris's drug abuse. All of these facts were relevant to Harris's ability to deliberate and to feel remorse, his primary defenses at the penalty phase of the trial. Ryan's defense strategy was well-calculated and was based on far more than "speculation" and "secondhand bits and pieces of mitigation evidence," and was well within the wide range of professionally competent assistance. *Id.* at 1161.

## XII. *Unlawful Interrogation*

■ Harris contends in his habeas petition that his constitutional rights were violated because the prosecution relied on Joey Abshire, a jailhouse informant who

testified during the guilt phase that Harris admitted to the murders and that he killed the boys because the boys could identify him. We found that Harris's petition had "not provided any evidentiary basis to support these allegations of wrongful government conduct." *Harris*, 913 F.2d at 629. While Harris's petition for rehearing was pending, Harris filed a motion with this court to remand this case to the district court for an evidentiary hearing on the Abshire issue. *See Harris v. Vasquez*, 928 F.2d 891 (9th Cir.1991). The motion was supported by newly obtained declarations by Abshire and another inmate of Harris's, Sonny Wisdom. Because the declarations had not been presented to the district court and the allegations may have, if proved true, established a right to habeas relief, we remanded for an evidentiary hearing on this issue. *Id.* at 893–94; *see Terrovona v. Kincheloe*, 852 F.2d 424, 429 (9th Cir.1988) (an evidentiary hearing is required "if (1) the petitioner's allegations, if proved, would establish the right to relief; and (2) the ... trier of fact has not, after a full and fair hearing, reliably found the relevant facts"), *cert. denied*, —— U.S. ——, 111 S.Ct. 1631, 113 L.Ed.2d 726.

At the requested hearing, Abshire testified that investigators in the District Attorney's Office recruited him to question Harris, that he was a state agent at the time he questioned Harris and at the time Harris told Abshire that he killed the boys to avoid being identified, and that he lied while testifying at Harris's trial. The court also heard testimony from Sonny Wisdom and Eddie Ponce de Leon (inmates of Harris and Abshire), investigators who tape recorded their interview with Abshire about Abshire's conversations with Harris, Harris's prosecutor (and now California Appeals Court Judge) Richard Huffman, and police sergeant Shramek who testified that he was outside Harris's cell when Harris told Abshire why he killed the boys.

Other than Abshire's testimony, no substantial evidence of an agency relationship was presented at the hearing. Abshire's testimony that he was recruited by state officials, the court found "was unbelievable and untruthful and not entitled to any weight. It is without corroboration from any independent source and was flatly contradicted by numerous witnesses." In addition, based in part on his demeanor and manner of testifying, the court found that "[n]ot only [did] Abshire lack credibility, but the court finds, without a doubt, that he lied to this court." Such findings are given substantial deference. *Anderson v. City of Bessemer*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1984).

In addition to lack of corroboration and incredibility of Abshire's testimony, the court found compelling certain notes taken by sergeant Shramek outside Harris's cell while Harris and Abshire talked. Shramek's testimony at the hearing, the court found, was consistent with his notes and Abshire's trial testimony. Finally, the court considered a tape recording of Abshire's conversation with state investigators on July 26, 1978. In this recording, Abshire states that Harris told him that he killed the boys to avoid being identified. Abshire testified at the evidentiary hearing that he did not make that statement on July 26, but "on August 21 or about a week after." A transcript of the tape recording, however, had been received by Harris's trial counsel no later than August 14. Though Abshire claimed that the tape had been tampered, altered, or edited, the district court found this argument "unsupportable and unbelievable" and concluded that the recording "accurately reflect[s] the contact between Abshire and the district attorney's investigators." Harris does not argue on appeal that the tape was falsified in any way. The district court concluded:

> Based on the existing record and the evidentiary findings, the court finds that Harris has not proven constitutional error on any of the grounds articulated in this proceeding, and that he is not entitled to habeas corpus relief from either his conviction or sentence.

On appeal, Harris does not contest the district court's factual findings, but argues that he was denied a full and fair hearing on his claim that Abshire was a government agent. He also argues that the evi-

dentiary hearing reveals the prosecution concealed the full extent of the negotiations and benefits Abshire received in exchange for his testimony. As to the denial of a full and fair hearing claim, Harris argues first that the district court improperly denied two discovery motions. *See infra* Part V. The requested materials involved two instances of prior misconduct by members of the San Diego District Attorney's Office, including Harris's prosecutor and an investigator who questioned Abshire about Harris. *See In re Hancock,* 67 Cal.App.3d 943, 136 Cal.Rptr. 901 (1977), *People v. Moore,* 57 Cal.App.3d 437, 129 Cal.Rptr. 279 (1976). The requests "should have been granted," Harris argues, "because it reasonably may have led to additional admissible evidence probative of a pattern and practice of misconduct, the existence of intent and absence of mistake in recruiting Abshire and/or misleading the jury regarding the benefits he sought and received." Harris provides no evidence beyond this assertion and Abshire's declaration, however, that the misconduct described in *Moore* and *Hancock* also took place in connection with the prosecution of Harris. Based upon the record, we find the district court did not abuse its discretion in denying Harris's discovery motions. *Jett v. Sunderman,* 840 F.2d 1487, 1491 (9th Cir.1988).

Harris next argues that the district court, while permitting evidence to show the "strength" of the prosecution's case (to the extent it was relevant to show the state's lack of motive to engage Abshire as a state agent), improperly precluded him from refuting the state's evidence. The evidence Harris's counsel sought to elicit from Harris's prosecutor on cross examination involved the state's knowledge of Harris's mental health. The evidence admitted relevant to the state's belief in the strength of its case, however, did not relate to Harris's mental condition. The district court ruled that evidence regarding the mental state of Harris was beyond the scope of the

direct examination and our remand order. Harris was never precluded from presenting evidence to refute the evidence the state relied upon, only additional evidence regarding Harris's mental state. After reviewing the record, we do not find the court's evidentiary rulings were an abuse of discretion. *Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc.,* 875 F.2d 1369, 1378 (9th Cir.1989).

Harris also complains about the weight the district court afforded the July 26 tape recording. Abshire testified that he was recruited to be a state agent in his meeting with investigators on July 26, but that he was unable to extract an incriminating statement from Harris until sometime later. On the tape recording, however, Abshire states that Harris had already made the incriminating statements Abshire testified to at trial. Evidence regarding the tape's chain of custody, reproduction, and transcription was considered by the district court. The court found it "highly probably that the defense received the tape and transcript within three days of the interview." At the latest, Harris's trial counsel received a transcript of the recording no later than August 14 when he acknowledged its receipt. This is earlier than the August 21 or later date that Abshire claims he told investigators of the incriminating statement. Harris does not argue on appeal that the tape has been falsified and concedes that "Abshire is incorrect about when the tape must have been made."

Harris argues, however, that the "real barrier to the district court['s] accept[ance]" of Abshire's testimony about the recording was its reliance on the testimony of the state's witnesses that the tape was made on July 26. Such reliance was improper, Harris argues, because of the court's rulings on Harris's discovery motions and attempts to admit evidence on Harris's mental state. Because we find these rulings were not improper, we reject this argument.[23]

---

**23.** The State asserts that "[t]he Abshire claim was built on lies, combined with fabrication and memorization and compounded by unfair and deceptive investigative techniques," and, relying

on Rule 11 of the Federal Rules of Civil Procedure, "submits sanctions are appropriate in this case." Respondent's Brief, 13, 11 n. 9. Although Harris's motion to remand was filed in

Harris also argues that, regardless of whether Abshire was a government agent, Abshire's trial testimony about the extent of the benefits he received in exchange for his testimony was materially inaccurate. Abshire testified at trial that in exchange for pleading guilty to a count of burglary and his testimony at the Harris trial he would not be extradited to Louisiana and charges against him in California would be dismissed. He also testified that there was no negotiations over the length of the sentence he would receive in California. At the evidentiary hearing on remand, Abshire testified that the negotiations did include discussion about the length of his sentence. These discussions were confirmed by the testimony of Abshire's attorney who negotiated the bargain.

 The prosecution's alleged concealment of the information regarding the sentencing aspects of Abshire's bargain and the presentation of Abshire's testimony, Harris argues, violates his rights under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (right to disclosure of all material evidence), *Mooney v. Holohan,* 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935) (right to trial free of state-sponsored perjury), and *Johnson v. Mississippi,* 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1978) (right to reliable determination of guilt and penalty). Under *Brady,* the prosecution must disclose "evidence that is both favorable to the accused and 'material either to guilt or to punishment.' " *United States v. Bagley,* 473 U.S. 667, 674, 105 S.Ct. 3375, 3379, 87 L.Ed.2d 481 (1985) (quoting *Brady,* 373 U.S. at 87, 83 S.Ct. at 1197). Evidence is material under *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* 473 U.S. at 682, 105 S.Ct. at 3383. The district court found that "even if the jury did not have the complete details of Abshire's plea agreement.... [t]here is

nothing ... that undermines this court's confidence in the outcome of Harris' trial." We agree. It is extremely unlikely, much less probable, that had the jury known that Abshire had negotiated for a reduced sentence—in addition to dismissal of charges and avoidance of extradition—the outcome of Harris's trial would have been different. For the same reason, we find no violation of his rights under *Johnson* or *Mooney. See id.* at 678, 105 S.Ct. at 3381–82 (" 'a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside *if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury'* ") (quoting *United States v. Agurs,* 427 U.S. 97, 112, 96 S.Ct. 2392, 2401–02, 49 L.Ed.2d 342 (1976)) (emphasis added).

We find no error in the district court's factual findings and conclusions made pursuant to our remand order. We also find the district court did not abuse its discretion in denying Harris's discovery motions and precluding evidence regarding Harris's mental state. The court's conclusions regarding the timing and accuracy of the tape recording are also sound. Finally, we agree with the district court that any inaccuracies in Abshire's testimony about his plea bargain at Harris's trial was immaterial and does not warrant habeas relief.

### XIII. *Conclusion*

Rules 9(a) and 9(b) allows for dismissal of Harris's petition. Harris has not shown cause for failing to present his habeas claims in an earlier petition, or presented a colorable claim of factual innocence and has therefore abused the writ. Additionally, Harris's claims fail on their merits. The state provided Harris with access to two psychiatrists of his own choosing, at state expense. Harris has not shown that the state in any way denied him access to psychiatric assistance required by *Ake.* Harris's claim that he is entitled to an evidentiary hearing to challenge the competency

this court, it is unclear whether Rule 11 would permit us to impose sanctions. *See Partington v. Gedan,* 923 F.2d 686, 688 (9th Cir.1991) (en

banc) ("Rule 11 sanctions may no longer be imposed in our circuit on appeal"). In any case, we do not believe the claim warrants sanctions.

of the prosecution and defense psychiatrists would require this court to adopt a new rule of constitutional law. We cannot do so under *Teague.* Harris has not demonstrated that California has created a right to challenge to the competency of psychiatric assistance based on Cal.Penal Code § 987.9. Harris has not presented any "new evidence" of his mental condition at the time of the offense or at trial. Dr. Griswold did not testify falsely regarding Harris's potential for rehabilitation and lack of remorse in violation of Harris's due process or eighth amendment rights. Harris has failed to show that he received ineffective assistance of counsel. Finally, Harris's claims arising from the questioning and testimony of Abshire received a full and fair hearing before the district court. We agree with the district court that these claims do not warrant federal habeas relief.

AFFIRMED.

NOONAN, Circuit Judge, concurring in part and dissenting in part:

This court is asked to decide a very narrow issue. It is: Is Robert Alton Harris entitled to an evidentiary hearing as to any of his claims? In other words, do we know enough right now, without a district court finding any facts, to say that Harris' claims, even if true, entitle him to no relief?

I agree that for the reasons stated by the majority Harris' petition does not require a hearing on the ground that he was deprived of the effective assistance of counsel or that he has turned up new evidence or that the state put forward false testimony against him or that an undisclosed agent of the government testified against him. I also agree that Harris' mental state was not an issue requiring psychiatric evidence in the guilt phase of his trial. I respectfully disagree with my colleagues because I believe that Harris has a right to present evidence as to whether he was denied his constitutional right to effective psychiatric assistance in the penalty phase of his trial.

I reach this conclusion in four steps, none of which I find in doubt:

1. A new constitutional right of "bedrock" fairness affecting the accuracy of the determination of the triers of fact, found by the Supreme Court to exist after the conclusion of a trial and after the filing of a petition for habeas corpus that is before the court, may be asserted retroactively by a defendant.

2. Such a new constitutional right to effective psychiatric assistance was established by the Supreme Court in 1985, after Harris' trial and while his second petition for habeas corpus was before the courts.

3. Harris alleges that he has evidence to show that he was denied effective psychiatric assistance in the hearing on his sentence.

4. Therefore, Harris is entitled under our law to a hearing that will determine if his evidence will prove what he alleges.

In 1985, in *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the United States Supreme Court established a new, previously unknown right: the right of a defendant on trial for his life to have effective psychiatric assistance if his mental state was at issue. If the defendant was too poor to pay for such help, the state had the duty to provide it. The right and corresponding duty were created by the Supreme Court finding in the Constitution this requirement of fundamental fairness.

Most new constitutional rules are not applied retroactively. If, however, the rule enhances the accuracy of the determination of the facts *and* goes to fundamental fairness, the rule is applied retroactively. The *Ake* rule is of this kind.

Applying a rule retroactively is upsetting. The rule was not known at the time. The state was innocently ignorant of its duty. The defendant and his lawyer were unaware of what they could ask. Retroactive application means re-creating the earlier proceeding and asking, "What did the defendant have a right to, if the rule had been in effect?" The answer is, "A right to effective psychiatric assistance, provided

by the state if the defendant was too poor to pay for it."

Harris was too poor to pay for it. He alleges he did not get it. The state says he did. No evidence has been taken. We have only allegations, declarations, affidavits, and arguments, none of them tested by cross-examination. If Harris' claim should be true, he is entitled to a new trial as to his sentence. If it should not be true, he must face execution. We must therefore take the time to let a federal district judge hear evidence and decide what the facts are. An evidentiary hearing must be held.

Creating the new right that now exists, the United States Supreme Court gave a new status in criminal law to a set of procedures and opinions that are a mixture of empirical data, accepted theories, disputed hypotheses, intuition and art. Psychiatry is a delicate tool, highly dependent on the ability and experience of the practitioner. Brought by the Constitution into conjunction with the blunt question of a capital case—Yes or No, Life or Death?—sensitive psychiatric skill can illuminate dark corners of the defendant's mind so that a jury of lay persons may feel more confident of their verdict. But that every capital case—and, logically, every criminal case—should be illuminated by psychiatry is not a proposition that our law has accepted.

The case for an evidentiary hearing as to the need for psychiatric assistance in the penalty phase of Harris' trial will now be spelled out in more detail.

*The standard set by* Ake. *Ake* requires that where the defendant's mental state is at issue, the state "at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." *Ake v. Oklahoma,* 470 U.S. at 83, 105 S.Ct. at 1096. Failure to conduct an appropriate examination or failure to assist in evaluation, preparation and presentation of the defense is failure to meet the standard set.

That this standard is an essential part of the holding in *Ake* is underlined by the dissent in that case. Justice Rehnquist states that he would not grant "the broad right to 'access to a competent psychiatrist who will conduct an appropriate examination, *and assist in evaluation, preparation and presentation of a defense.'* " *Id.* at 92, 105 S.Ct. at 1101, (dissenting opinion; emphasis in the original). Seven members of the Court thought otherwise. Seven members of the Court granted the right that Justice Rehnquist would have denied.

The State of California argues that *Ake* is satisfied if the state provides a psychiatrist whose competency is indicated by his professional license. But in psychiatry, as in law, professional licensing is no guarantee that the practitioner will perform competently. For a variety of reasons, summed up in the phrase "human fallibility," licensed professionals fail on occasion to measure up to professional standards.

The state in effect says, "No matter that the psychiatrist botched his job. All that the defendant had a right to was the opportunity to have a professional who might have been expected to do the job. We have no duty to provide more." The state's position puts form above substance. The state's position permits a charade to satisfy its obligations.

*Ake* begins its analysis of the need for "meaningful access to justice" by speaking of the "basic tools of an adequate defense or appeal." *Id.* at 77, 105 S.Ct. at 1093, quoting *Britt v. North Carolina,* 404 U.S. 226, 227, 92 S.Ct. 431, 433, 30 L.Ed.2d 400 (1971). *Ake* then emphasizes the metaphor of useful implements by twice referring to such "tools." *Id.* 470 U.S. at 77, 105 S.Ct. at 1093. The emphasis on tools is an emphasis on function. A non-functioning tool is useless; so is a non-functioning psychiatrist.

The state's position has never been accepted as to the analogous duty of the state to provide an indigent defendant with counsel. Since this obligation was first enunciated in *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), the obligation has been to provide "effective assistance." *Id.* 470 U.S. at 71, 105 S.Ct. at 1090. Ineffective counsel is no counsel at

all. *See Evitts v. Lucey,* 469 U.S. 387, 396, 105 S.Ct. 830, 836, 83 L.Ed.2d 821 (1985). Ineffective psychiatric aid is no aid at all.

It might be argued that the obligation to provide counsel, being rooted in the specific language of the Sixth Amendment, requires more of the state than the obligation to provide psychiatric assistance. Such an argument would be mistaken. Both the obligation to provide counsel and the obligation to provide psychiatric aid are comparatively late constitutional developments. Neither are required by the express text of the original Constitution or the Bill of Rights. Both have emerged as the Court has concluded, in the light of experience, what must be done in order to preserve those rights that the Bill of Rights guarantees.

The right to counsel of the accused in a trial in a state court, and the obligation of the state to provide effective assistance of counsel to the indigent, are founded on the requirement of the Fourteenth Amendment that no person's life, liberty, or property be taken "without due process of law." That succinct and fertile phrase, read by the Court in the light of experience and with reference to the Sixth Amendment's declaration of federal rights, led the Court to impose upon the states of the United States the duty to provide effective legal assistance to an impoverished defendant. Analogously, due process of law, read by the Court in the light of experience, has led the Court to impose upon the states the duty of effective psychiatric assistance to a defendant otherwise too poor to afford it.

As with the right to counsel, a Sixth Amendment federal right is relevant to the Court's construction of "due process of law" in the Fourteenth Amendment. The Sixth Amendment guarantees an accused the right "to be confronted with the witnesses against him" and "to have compulsory process for obtaining witnesses in his favor." The Sixth Amendment in this way guarantees that a trial will be a contest of witnesses. When only the state can afford expert witnesses, and when the testimony of the expert witnesses will be crucial, the trial ceases to be a contest of witnesses.

The expert testimony becomes a parade of the state's experts—in the usual case, all well-meaning, honest, and qualified; but none of them "confronted" by knowledgeable cross-examination, none of them met by expert witnesses in favor of the accused. To assure "fundamental fairness" as *Ake* puts it; to prevent the trial from being a charade; to preserve the constitutional meaning of a trial as a forum in which witnesses confront the accused and the accused confront the witnesses and, moreover, has witnesses in his favor, the obligation has been put upon each state to give effective psychiatric assistance to the accused against whom the state deploys psychiatric witnesses.

The state's basic objection to *Ake* appears to be that the burden imposed by *Ake* is burdensome. Prior to *Ake,* the State of California, to comply with state law, needed only to see that the accused be given the minimal funds needed to secure a minimal psychiatric examination by a licensed psychiatrist. *Ake,* as the state appears to fear, requires that the examination be competently performed and that the psychiatrist be sufficiently compensated that he will assist the evaluation, preparation, and presentation, of the defense.

A Pandora's box is opened up, the state exclaims. The courts will sink in a morass of post-trial challenges to the effectiveness of the psychiatric assistance provided. Psychiatrists, the state adds, are notoriously apt to differ from each other. A defendant will always be able to get a second psychiatrist to say his first psychiatrist performed incompetently.

A fair appraisal of what has happened in the five years since *Ake* was decided does not confirm the state's fears. It is true that permitting a challenge to the psychiatric aid given a defendant must result in enlarging the grounds on which state verdicts may be questioned. The same observation would have been true of the effect of recognizing the right to the effective assistance of counsel.

The analogy with the right to counsel holds also as to the likelihood of disagreement among psychiatrists. Lawyers also

are known for their disputatiousness and their ability to carve out positions differing from those of their peers. The potentiality, even likelihood, of one lawyer differing from another lawyer's view of the effectiveness of trial strategy has not made unworkable the constitutional insistence on effective assistance.

No profession exists on this earth, whether it be theology or law or medicine or judging, in which the professionals do not disagree with each other, sometimes noisily, sometimes deeply. It has never been a barrier to measuring competent performance in such fields that there are such disagreements and disputes, that there are schools of thought, that there are different ways of evaluation and procedure. Psychiatry is no different from any other learned, disputatious profession. As academic institutions have learned to measure effective performance in the contentious disciplines that constitute their curriculum, as courts of law have learned to measure effective performance in criminal trials, so there is no barrier to standards of competent performance being set and applied to the psychiatric assistance furnished the accused.

Ake *and the sentencing phase.* The defendant in *Ake* had raised the issue of the denial of psychiatric assistance at his trial and its denial at the penalty phase. The Supreme Court held in a separate section of its opinion that when the state places evidence before the penalty jury of the future dangerousness of the defendant, the defendant has a right to a psychiatrist exactly as in the trial phase. Referring to its discussion of this right at the trial phase, the Court declared: "The foregoing discussion compels a similar conclusion in the context of a capital sentencing proceeding, when the State presents psychiatric evidence of the defendant's future dangerousness." *Ake v. Oklahoma,* 470 U.S. at 83, 105 S.Ct. at 1096.

Again, Justice Rehnquist underlined the holding. Dissenting, he objected that "there was no need to reach issues raised by the sentencing proceeding, so the discussion of this issue may be treated as dicta." *Id.* at 92, 105 S.Ct. at 1101 (dissent-

ing opinion). Again, seven members of the Court thought otherwise, not accepting his label of the opinion as dicta. So did the court that tried Ake again in Oklahoma, which, supplying him with psychiatric assistance at the trial stage where he was again found guilty, again supplied him with psychiatric assistance at the penalty phase, where he received a life sentence instead of death. *New York Times,* February 14, 1986, p. 15.

Whatever art is used to distinguish as dicta the pronouncement of lesser courts, a solemn exposition of constitutional law by the Supreme Court on an issue in the case, although arguably not essential to the disposition of the case, is not to be easily dismissed as dicta. The requirement of a psychiatrist at the penalty phase is a holding of the Court.

A case, famous in history, underscores this conclusion. In *Dred Scott v. Sanford,* 19 How. 393, 15 L.Ed. 691 (U.S.1857), the Supreme Court held that a descendent of black slaves could never be a citizen of the United States. The Court also held that Congress could not prevent the introduction of slavery into the territories. The second ruling was unnecessary once it was determined that Dred Scott did not have status to sue. Nonetheless, the second ruling was treated by all knowledgeable persons as a holding. The Civil War was not fought over dicta.

*The Novelty of* Ake. The Supreme Court, prior to *Ake,* had never enunciated the right of an indigent defendant to the effective assistance of a psychiatrist in the evaluation, preparation and presentation of his case. Thirty-two years earlier the Court had decided *United States ex rel. Smith v. Baldi,* 344 U.S. 561, 73 S.Ct. 391, 97 L.Ed. 549 (1953). In that case the defendant on September 21, 1948 had pleaded guilty to murder. After the plea a question was raised as to the defendant's sanity. On October 28, 1948 two psychiatrists were called by the defense; on November 5, 1948 a psychiatrist appointed by the court testified. The defendant was found sane and sentenced. The Supreme Court, disposing of the issue as it was raised on

habeas corpus, declared: "As we have shown, the issue of petitioner's sanity was heard by the trial court. Psychiatrists testified. That suffices." *Id.* at 568, 73 S.Ct. at 395.

In a dissent joined by two other members of the Court, Justice Frankfurter doubted whether the plea of insanity had been properly rejected, his doubt exacerbated by the newly-discovered fact that the court-appointed expert, the psychiatrist on whom the trial court relied, had himself been committed for incurable mental illness. *Id.* at 572, 73 S.Ct. at 396–97. *Baldi* enunciated no right to effective psychiatric assistance. The case was thereafter "often invoked to deny an indigent defendant's right to psychiatric assistance." Note, *Expert Services and the Indigent Criminal Defendant: The Constitutional Mandate of Ake v. Oklahoma*, 84 Mich.L.Rev. 1326, 1353 (1986).

From 1791 to 1985 the Supreme Court had never held that there was a right to effective psychiatric assistance that the states must satisfy by providing such assistance to an indigent accused. If confirmation is needed for a statement evident from the Court's own decisions, *Ake* was described in the law reviews as the announcement of "a significant new right," *The Supreme Court—Leading Cases*, 99 Harv.L.Rev. 120, 131 (1985) or a "breakthrough," Note, *Expert Services*, 84 Mich. L.Rev. at 1329. The decision in its impact was analogized to *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932) and *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), *see* Note, *Fourteenth Amendment Due Process and An Indigent's Right to Court–Appointed Psychiatric Assistance in State Criminal Proceedings*, 76 J.Crim.L. and Criminology 1065, 1074 (Winter 1985).

It is no accident that, as of *Ake*, "very little had been known" about the neuropsychiatric status of persons condemned to death. D. Lewis et al., *Psychiatric, Neurological and Psychoeducational Characteristics of 15 Death Row Inmates in the United States*, Am.J.Psychiatry 143:838, 839 (July 1986). Very little research had

been done because no constitutional right to psychiatric assistance in capital cases had existed. The scientific void matched by the constitutional void.

The limited psychiatric research that has been done since *Ake* on murderers condemned to death has revealed neurological impairment, psychiatric illnesses, cognitive deficits and parental abusiveness in a significantly high proportion of the condemned. D. Lewis et al., *Neuropsychiatric, Psychoeducational, and Family Characteristics of 14 Juveniles Condemned to Death in the United States*, Am.J.Psychiatry, 145:584 (May 1988). These "potentially mitigating factors" had not been developed when these defendants were sentenced. *Id.* Only later, "lengthy, painstaking interviews" revealed the problems. *Id.* The *Baldi* standard—"[p]sychiatrists testified"; case closed—had been the rule.

A case "announces a new rule when it breaks new ground or imposes a new obligation on the States or the federal government." *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 1070, 103 L.Ed.2d 334 (1989). The *Ake* right and obligation were new.

*The impact of* Ake *on the fundamental fairness of the determination of the penalty.* The rule of *Ake* being new, it cannot as a matter of course be applied to attack collaterally a state judgment in a habeas corpus proceeding. "Without finality, the criminal law loses its effect." *Teague* 109 S.Ct. at 1074 (plurality opinion). The state courts are understandably frustrated when they apply existing constitutional law only to have a federal court discover during a habeas proceeding that there are new constitutional commands the state must apply. *Id.* at 1075. The rule of *Teague* has been extended to habeas corpus in capital cases. *Sawyer v. Smith*, —— U.S. ——, 110 S.Ct. 2822, 111 L.Ed.2d 193 (1990). Accordingly, *Ake* cannot be applied retroactively here unless it meets the test of an exception created by *Teague* itself.

The exception that is relevant was created by *Teague*, referring to Justice Harlan's separate opinion in *Mackey v. United States*, 401 U.S. 667, 693, 91 S.Ct. 1160,

1180, 28 L.Ed.2d 404 (1971), which in turn invokes the classic language of Justice Cardozo in *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937). Justice Cardozo had spoken of those requirements that are "implicit in the concept of ordered liberty." It was those procedures that Justice Harlan said should be applied retroactively. Those procedures were developed, Justice Harlan noted, by "time and growth in social capacity." *Mackey* 401 U.S. at 693, 91 S.Ct. at 1180; so that although they involve "bedrock procedural elements," *id.*, they are nonetheless subject to development. The *Teague* plurality, quoting this language of Justice Harlan, termed such rules "watershed rules of criminal procedure." The *Teague* plurality then limited such rules that could be retroactively applied to "those new procedures without which the likelihood of an accurate conviction is seriously diminished." *Teague* 109 S.Ct. at 1076–1077.

The exception has been further refined by the majority opinion of Justice Kennedy in *Sawyer:* "A rule that qualifies under this exception must not only improve accuracy, but also 'alter our understanding of the *bedrock procedural elements*' essential to the fairness of a proceeding." *Sawyer v. Smith*, 110 S.Ct. at 2831 (quoting *Mackey;* emphasis in *Sawyer*). As *Sawyer* makes clear, the Court has "modified Justice Harlan's test," so that the new rule if it is to be applied retroactively must both go to bedrock fairness and significantly improve the accuracy of the determination made by the triers of fact. *Id.*

The majority in the present case doubt that the new rule of *Ake* is of this fundamental character and that *Ake* announces a watershed rule. But we need go no further than *Ake* itself. *Ake* reached the result it did and indicated its disagreement with *Baldi* because in *Ake* the Court resolved affirmatively the question it asked itself: "whether fundamental fairness today requires a different result". *Ake* 470 U.S. at 85, 105 S.Ct. at 1097. After *Ake*, no one could suppose that the sanity of a defendant in a capital case could be determined by the testimony of a licensed psychiatrist of doubtful sanity himself. After

*Ake*, no one could suppose that due process was satisfied because "[p]sychiatrists testified" or because licensed psychiatrists were made available by the state. In the light of *Ake*, bedrock fairness requires effective psychiatric assistance if the defendant's mental state in a capital case is at issue.

The conclusion of *Ake* itself as to the character of its rule is confirmed by the cases used by *Teague* to illustrate a new rule for retroactivity purposes. These cases are *Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (*per se* rule excluding all hypnotically refreshed testimony infringes impermissibly on a criminal defendant's right to testify on his behalf); and *Ford v. Wainwright*, 477 U.S. 399, 410, 106 S.Ct. 2595, 2602, 91 L.Ed.2d 335 (1986) (Eighth Amendment prohibits the execution of prisoners who are insane). Neither of these cases is of the sweeping character of *Ake*. If they stated new rules, *a fortiori*, *Ake* did. In contrast, a rule limiting what a prosecutor may tell a penalty-phase jury about its responsibilities is not a bedrock rule and does not fall within the *Teague* exception. *Sawyer*, 110 S.Ct. at 2832.

A question which is open to argument is whether the *Ake* rule, as applied in the penalty phase, enhances the accuracy of conviction. Literally, as conviction has already been obtained, the sentencing phase can not fit within the exception. But to a person facing death the sentencing phase is as crucial or more crucial than the trial itself. It is difficult to conclude that *Teague* or *Sawyer* meant to exclude the sentencing phase when they spoke of accuracy of conviction. In sentencing, as in the determination of guilt, the interest of justice is served by the jury being accurately informed. When a jury is not able to consider and give effect to all the mitigating evidence, there is constitutional error. *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934 at 2948, 106 L.Ed.2d 256 (1989).

The battle of the psychiatrists is as important to the jury in the penalty phase as it is in the guilt phase. Effective psychiatric assistance at the penalty phase enhanc-

es the jury's ability to determine with full information whether death is the appropriate penalty. Without the benefit of such psychiatric opinion there is "a much greater likelihood of an erroneous decision." *Ford v. Wainwright*, 477 U.S. 399, 414, 106 S.Ct. 2595, 2604, 91 L.Ed.2d 335 (1986), citing *Ake* (plurality opinion).

When monstrous deeds are done, such as the killing of the two boys in this case, there is a natural desire to avenge the outrage and to eliminate its perpetrator. At the same time the suspicion, if not the certainty, must occur to reasonable persons that the person who performed such awful deeds is, if not insane, at least laboring under an infirmity of mind. Normal human beings, one thinks, could not engage in such cruel and callous conduct. If these suspicions of mental abnormality were, in fact, confirmed by competent psychiatric testimony that the perpetrator had severe mental impairments, a humane and civilized jury would undoubtedly consider such evidence in mitigation because a humane and civilized jury could not judge a mentally impaired person in the same way it would judge a person free of such tendencies. The final verdict of such a jury cannot, of course, be forecast. But to deprive a jury of information that might materially alter its estimate of the proper penalty is to deprive the jury of information essential to its accurate determination of the appropriate penalty.

The state argues that a conflict of psychiatric experts would not enhance the accuracy of the jury's work but only generate confusion. The state goes on to describe psychiatry as not a science but a "mass of disputes." The opinion of the majority does not descend to denigration of psychiatry but the opinion still stresses that all that would result if Harris prevailed in winning a remand on sentencing would be differing psychiatric testimony.

If Harris' claims should be true, however, the state's psychiatrist, Dr. Griswold, would be shown by testimony to have been wrong in his diagnosis; and a jury could believe such testimony. If Harris' claims should be true, Harris would be shown to have been a person with organic brain deficiency; and the jury could believe such testimony. If Harris' claims should be true, Harris would not be a killer suffering from an antisocial personality that he could have controlled but did not; he would be a criminal who fell below the standard set for measuring fully rational human beings.

The right of the defendant and the duty of the state come into play when the mental state of the defendant is put in issue. The state made Harris' mental state an issue by Griswold's testimony. It is not relevant that the issue was raised on rebuttal. *Ake* does not ask whether the evidence is part of the prosecution's initial case or whether the evidence is adduced on rebuttal. According to *Ake*, the right to psychiatric assistance arises when the state presents "evidence of the defendant's future dangerousness." *Ake v. Oklahoma*, 470 U.S. at 83, 105 S.Ct. at 1096. Dr. Griswold testified that an antisocial individual "tends to be immature, emotionally unstable, callous, irresponsible, manipulative, impulsive, egotistical, has an inability to profit from past experience or punishment, projects the blame on someone else, and does not feel true remorse for crimes he commits." *Harris II* at 1381. Introducing Griswold's testimony, the state presented evidence of Harris' future dangerousness.

Fundamental fairness is the ground of the *Ake* right. Whether psychiatry is the state's first or last word, fundamental fairness is violated if only the state has effective psychiatric assistance; the deck is then loaded against the defendant. The testimony that Griswold offered, we expressly held in *Harris II*, was evidence that the jury could consider as an aggravating factor pointing the jury to the imposition of death. *Harris II*, 885 F.2d at 1382–84. To hold that with the aid of psychiatric testimony the state may rebut the defendant's testimony as to his mental state or prove an aggravating factor but that the defendant has no right to psychiatric assistance to challenge that testimony is to mock *Ake*'s command of fairness.

*The State's Role in Denying Assistance to Harris.* The question remains: Assum-

ing that Harris' allegations of incompetent analysis by his psychiatrists are true, was he deprived of psychiatric assistance *by the state?* His counsel selected the psychiatrists. His counsel decided not to present their findings. His counsel made no criticism of their work. His counsel made no request of the trial court for funds to pay for a more extensive psychiatric examination than a $1,000 fee to a psychiatrist would obtain. If Harris' psychiatrists fell below a standard of competence, was the fault not that of his counsel?

In our system of justice, the lawyer holds the key. If Ryan did his job competently, he necessarily decided that the two psychiatrists had done as much as could be expected, that nothing more needed to be done. If Ryan did his job incompetently, he may have let incompetent work by the psychiatrists slide by. But Harris cannot now attack Ryan's performance as a lawyer; the issue has been raised and decided against him. *Harris II*, 885 F.2d at 1367–68. Inability to question Ryan's work appears to foreclose the opportunity to challenge the work of the psychiatrists Ryan chose and consulted with and was guided by. If competent counsel at the time was satisfied with the psychiatric assistance furnished, that assistance cannot be retroactively made the subject of litigation.

But we are dealing with a case where counsel had no reason to believe that such a constitutional right existed. Harris had been given the minimum afforded by statute. Competent counsel knew nothing more to ask. Ryan did not ask for what he did not know he had a right to ask. It frustrates the retroactivity of the new constitutional right to let his uninformed acquiescence be decisive. In this case, where a new and fundamental right is being retroactively upheld, it is only just that the district court make its own determination of the competence of the psychiatrists. The state will be found to have failed its obligation to assure effective psychiatric assistance if in fact the funds provided and the time allowed were insufficient for the psychiatrists chosen by Ryan and appointed by the court to do their job properly and/or the incompetent work of the state's own psychiatrist actively misled the psychiatrists acting for Harris.

A second contention meshes with Harris' challenge to the assistance he received from his own psychiatrists. He challenges Dr. Griswold's testimony as false. If Harris' new psychiatric witnesses are right, Griswold was certainly wrong. But Harris presents not a scintilla of evidence that the state in using Griswold presented a witness the state knew to be presenting false testimony, cf. *Evans v. Eyman*, 363 F.2d 540, 542 (9th Cir.1966). As far as the record shows, the state in good faith put on Griswold as an experienced psychiatrist presenting his best analysis of Harris' psyche. That other psychiatrists disagree with what Griswold said or how he proceeded does not convict the state of misconduct requiring a retrial of the penalty phase.

Harris refines his argument to say that Griswold's testimony was "materially inaccurate." He draws help from *Johnson v. Mississippi*, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988). In that case a penalty phase jury in Mississippi was accurately informed by the state that the defendant had been convicted of rape in New York; the jury voted death. The defendant then got his New York conviction set aside. The death sentence was reversed because the jury had acted on information that was not false but turned out to have been "materially inaccurate." *Id.* at 590, 108 S.Ct. at 1983. So in his case, Harris argues, Griswold's opinion is shown to be materially inaccurate.

To those who view psychiatry as a soft science or an art full of subjective theories, there is no comparison between *Johnson v. Mississippi* and the present situation. In *Johnson* a legal record was changed. What was once accurate became inaccurate. No subjectivity entered into this determination. In contrast, here one psychiatrist contends that another psychiatrist did not do his job; it is only a matter of opinion.

This view of the matter does not, it seems to me, give full weight to the value authoritatively attached to psychiatric opin-

ion by *Ake.* It may well be that after a hearing of the proffered testimony of Harris' psychiatrists and their cross-examination by the prosecution, the district court would conclude that the new testimony had not shown that Griswold's was incompetent. On the other hand, it is entirely possible that this testimony would be so strong and convincing that no one would doubt that Griswold's had been materially inaccurate. The credibility and force of the proffered testimony cannot be measured in advance. There is a need for the evidence to be presented and tested in court.

But is the right to challenge Griswold's testimony subsumed within the new *Ake* right to effective psychiatric assistance? On its face, the challenge to Griswold's testimony is only a challenge to evidence that could have been challenged when the evidence was offered. But this superficial response is inadequate. Harris alleges that Griswold went unchallenged because he did not know of his *Ake* right to effective psychiatric assistance. If he had known and exercised that right, Griswold's testimony would have been impeached. So the *Ake* right encompasses here the charge that Griswold's testimony was materially inaccurate.

*Rule 9(a).* Rule 9(a) 28 U.S.C. § 2254 foll. (1988) requires dismissal if the state has been prejudiced in its ability to respond to Harris' claim; if prejudice resulted from his delay; and if he did not act with reasonable diligence. The district court held that these three conditions had been satisfied and that Rule 9(a) barred the *Ake* claim.

The district court was plainly in error. *Ake* was decided in 1985 after Harris filed his second habeas petition. He was not required to amend his petition to make the *Ake* claim but could wait for a final decision on the merits. *See* 1 J. Liebman, *Federal Habeas Corpus Practice and Procedure* 328 (1988). Harris acted with reasonable diligence once the second petition had been adjudicated.

*Rule 9(b).* Rule 9(b) requires dismissing of a second or successive petition of habeas corpus if it fails to allege "a new or different ground for relief and the prior determi-

nation was on the merits." 28 U.S.C. § 2254 foll. Rule 9(b) (1988). The contention is made that Harris' *Ake* claim was subsumed by his earlier claims of ineffective assistance of counsel and lack of due process. However, as has been shown, his *Ake* claim has nothing to do with the effective assistance of counsel because counsel was not ineffective in not asserting a constitutional right he did not know Harris possessed. Similarly, as *Ake* established Harris' right retroactively there was no basis for Harris raising an *Ake* claim in his earlier petition for habeas corpus, the latter of which was filed two year before the decision in *Ake.* The new constitutional right to effective assistance of a psychiatrist is surely not identical with the older constitutional right to effective assistance of a lawyer.

*The requirement of an evidentiary hearing.* Reliance is put by the majority on dicta in *Silagy v. Peters,* 905 F.2d 986 (7th Cir.1990). The holding, as distinct from the dicta, is congruent with what is said here. In *Silagy* federal courts had before them the transcript of the defendant's trial which showed on its face that the psychiatrists, accused of incompetence because of their credulousness, were in fact not credulous. Evidence, not speculation, supported the rejection of the collateral attack on the psychiatric testimony. In contrast, we are told here by the district court that the testimony of the surviving psychiatrist whom Harris charges with ineffective assistance is unavailable because the doctor is in Africa! The world is now a small place. The evidence of what the challenged psychiatrist did can be obtained and has not been obtained.

In a habeas corpus proceeding, "a federal evidentiary hearing is required unless the state-court trier of fact has after a full hearing reliably found the relevant facts." *Townsend v. Sain,* 372 U.S. 293, 312–13, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963). The rule of this circuit, repeatedly stated, is put succinctly as follows:

An evidentiary hearing is mandatory if (1) the petitioner's allegations, if proved, would establish the right to relief; and

(2) the state court trier of fact has not, after a full and fair hearing, reliably found the relevant facts.

*Terrovona v. Kincheloe,* 852 F.2d 424, 429 (9th Cir.1988). The opinion of the majority from time to time notes an absence of evidence on Harris' behalf. Harris was not required to produce evidence in his petition. Harris was given no opportunity to produce evidence outside his petition. What Harris was required to do and did do was to make allegations of a certain character and quality. No proof is required of the petitioner in advance of the evidentiary hearing if his allegations are specific and not frivolous. This court in *Harris I* expressly held that only *allegations* were required. *Harris I,* 692 F.2d at 1197.

Harris alleges that the two psychiatrists appointed by the San Diego Municipal Court to assist his defense failed to assist him in accordance with the appropriate standard of care; that they failed to provide competent assistance; that they did not perform adequate medical investigation; and that they thereby deprived him of essential mitigating evidence at the penalty trial and effective cross-examination of, and rebuttal to the testimony of Dr. Griswold, the psychiatric witness offered by the state. The allegations are specific. They are not frivolous. If proved they would establish that the constitutional right, announced by *Ake,* to effective psychiatric assistance in the evaluation, preparation, and presentation of his case was violated. No state court has made findings of fact as to these allegations. An evidentiary hearing is, therefore, mandatory.

Since the amended opinion of this court was filed on November 19, 1990, two relevant legal events have occurred: the panel (Noonan, J., dissenting) remanded the case for an evidentiary hearing on Harris' claim of an unlawful interrogation by the state; and the United States Supreme Court decided *McCleskey v. Zant,* —— U.S. ——, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991).

The remand for an evidentiary hearing on Harris' unlawful interrogation claim was an odd departure from what had already been established by this court in

*Harris v. Vasquez,* 913 F.2d 606, 618 (9th Cir.1990), where we held that it was an abuse of the writ to raise the issue. No more needs to be said on this question. I turn to the effect of Justice Kennedy's opinion for the Court in *McCleskey.*

The standard already in existence was that an excuse of failure to raise a constitutional objection required a showing by the petitioner of both cause for the failure and prejudice resulting therefrom. *Wainwright v. Sykes,* 433 U.S. 72, 87–88, 97 S.Ct. 2497, 2506–07, 53 L.Ed.2d 594 (1977). That Harris would be prejudiced by the nonallowance of his *Ake* claim is clear from what has already been said as to the effect that psychiatric testimony on his behalf might have had on the jury. The question remains whether *McCleskey* had an impact on Harris' *Ake* claim so far as the question of cause is concerned. It is clear that *McCleskey* does not preclude the claim.

The basic rule was established in *Reed v. Ross,* 468 U.S. 1, 104 S.Ct. 2901, 82 L.Ed.2d 1 (1984): "where a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in accordance with applicable state procedures." *Id.* at 16, 104 S.Ct. at 2910. The rule was reaffirmed in an opinion for the Court by Justice O'Connor, *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986). *McCleskey* pointedly cites *Murray* for an example of an "objective factor" that would impede counsel's effort to raise a claim. *McCleskey v. Zant,* 111 S.Ct. at 1470. Specifically, as Justice Kennedy quotes *Murray:* "'[A] showing that the factual or legal basis for a claim was not reasonably available to counsel'" suffices. *Id.* The *Ake* claim is of this character.

The majority in our case does not dispute the fact that the *Ake* claim was unavailable in the state courts before 1985. The majority writes:

Harris's conviction became final on October 5, 1981, when the United States Supreme Court denied certiorari. *Harris v. California,* 454 U.S. 882, 102 S.Ct. 365, 70 L.Ed.2d 192 (1981). *Ake* was decided

nearly four years later, on February 26, 1985, and only then established the rule of access to psychiatric assistance. Up to that time, without *Ake*, a state court had no reason to conclude that a criminal defendant had a constitutional right to state-funded psychiatric assistance at any stage of a criminal proceeding.

The majority points out that the Supreme Court granted certiorari in *Ake* on March 19, 1984. *Ake v. Oklahoma*, 465 U.S. 1099, 104 S.Ct. 1591, 80 L.Ed.2d 123 (1984). In a curious disparagement of their own devoted work, counsel for Harris argue that they then could have moved to amend their petition to include an *Ake* claim. But Harris would have had to abandon his federal petition and return to the state courts. The majority notes that a state court would have had no reason to change its rule until *Ake* was actually decided on February 26, 1985. Consequently, before that date it would have been futile for Harris to have pursued his *Ake* claim in the courts of California. By this date, the district court had denied his petition for habeas corpus and notice of appeal had been filed in the Ninth Circuit. The case was no longer within the jurisdiction of the district court. It was too late to amend his petition, and pursuing an appeal he thought meritorious, Harris had no reason to withdraw his federal petition and start all over again in the California system. Harris had cause not to raise his *Ake* claim in 1985.

Consequently, under the standard clarified by *McCleskey*, no barrier exists to consideration of Harris's claim under *Ake*.

### ORDER

Nov. 8, 1991.

Before ALARCON, BRUNETTI and NOONAN, Circuit Judges.

Judge Alarcon and Judge Brunetti have voted to deny appellant's petition for rehearing filed September 5, 1991, and to reject the suggestion for rehearing en banc. Judge Noonan would grant appel-

lant's petition for rehearing filed September 5, 1991, and would accept the suggestion for rehearing en banc.

The full court was advised of the suggestion for rehearing en banc. An active judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of votes of the nonrecused active judges in favor of en banc consideration. Fed.R.App.P. 35.

The petition for rehearing filed September 5, 1991, is denied and the suggestion for rehearing en banc is rejected.

REINHARDT, Circuit Judge, with whom Circuit Judge PREGERSON joins, dissenting:

Robert Alton Harris will in all likelihood be the first person to be executed in California in over twenty years—and only the second since Ronald Reagan assumed the office of Governor approximately a quarter of a century ago. I believe the opinion of this court which denies what may be Harris' final appeal is replete with legal errors—errors that require en banc review.

### I

Preliminarily, I think it important to discuss briefly one aspect of our en banc process and its relationship to the public's right to be fully informed on the subject of capital punishment. The en banc process allows the full court the opportunity to decide whether a three-judge decision upholding a death sentence correctly construes the Constitution and correctly applies controlling legal precedent. Yet, under our court rules, when a suggestion that the court hear a case en banc is rejected we do not announce the division. All we say is that a majority of the non-recused active judges failed to vote in favor of such a hearing. That tells the public little. We do not reveal whether the vote was close or even whether a majority of the eligible judges voted against en banc review.[1] Whatever the wisdom of that rule in general—and I believe the answer is that the

---

1. All active judges are eligible to vote. Under our rules, an en banc call fails unless a majority of the eligible non-recused judges casts affirma-

tive votes. Thus, a failure to vote has the same effect as a negative vote, and a tie-vote defeats the call.

rule is wrong under all circumstances—it clearly does not serve the public interest in death penalty cases.

I believe the people have a right to know if an individual is being executed notwithstanding the fact that a substantial number of judges who have examined the constitutionality of the state's proposed action believe further judicial review is necessary—and I believe that there is no justification for concealing the actual division in the court. There are good reasons why history should fully record the judicial votes in death penalty cases.

One of the continuing questions regarding both the propriety and constitutionality of the death penalty is whether it is arbitrary. Can the death penalty be applied in a manner that clearly and objectively separates those who should be put to death from those who are allowed to live? Is the law so clearly discernible that men and women of good will can in good conscience say—yes, a fair-minded individual would necessarily determine that the law classifies this case as one in which the taking of the defendant's life is proper? If such an objective classification cannot be made, should we not continue to question seriously the fairness and legitimacy of the process, and its application in particular cases? Knowledge of the actual votes leading to an individual's execution would be relevant to any attempt to answer these questions.

Ordinarily, we can tolerate the fact that the law rests on the judgment of fair-minded men and women—that law is what judges say it is. For when the law is unclear, as it often is, there is no better way of determining it than to have persons of integrity, trained in the skills of legal construction, examine the Constitution, statutes, and legal precedents and try their best to arrive at the most plausible resolution. But can we really tolerate the degree of subjectivity and built-in possibility of error inherent in such a system when deciding whether the state should take the life of one of its citizens? More particularly, can we really justify the taking of human life in a case in which, for example, four out of nine Justices of the Supreme Court, or up to half the members of this court of twenty-eight, may believe that the law prohibits us from doing so? Should life or death depend on the vote of one judge among many, when there are legitimate arguments on both sides and the decision could as easily go the other way? Under the current state of our law, the answer is clearly yes, although the Supreme Court, speaking through the Chief Justice, has recently cast some doubt on the durability, if not the legitimacy, of 5–4 decisions. *See Payne v. Tennessee,* — U.S. —, 111 S.Ct. 2597, 2611, 115 L.Ed.2d 720 (1991). This uncertainty gives rise to another question. Can decisions which may not reflect even tomorrow's law legitimize a man's execution? Whatever the answer to these questions, the people certainly have the right to all pertinent information relevant to the making of educated decisions about the capital punishment process.

It is clear that at present a substantial majority of the people favor capital punishment and the present Supreme Court firmly believes it is constitutional. However, law is an evolutionary process, and, at least until recently, our law has unfolded in an enlightened and progressive manner over a period of two hundred years. We can hope that over the next two hundred years further progress will be made and that we will return to a protective and expansive view of individual rights and liberties. Capital punishment will undoubtedly be one of the subjects we revisit. When we do, the historical record should be full and complete. At that time, as well as now, the people should know whether in the present case we failed to go en banc by an equally divided vote, a closely divided vote, or an overwhelming vote. For that reason, I regret that we are not now free to disclose that important information.[2]

---

**2.** The vote by which the Supreme Court denies certiorari is also not disclosed. However, the Supreme Court's certiorari procedure and our process for granting en banc review differ in at least two significant aspects. The Supreme Court's "rule of four" ensures that a decision not to review a case is favored by at least a two-to-one majority. Thus, disclosure of the vote

## II

Arbitrariness in the application of the death penalty is neither an abstract nor a closed subject. The debate continues unchecked. Within the last several weeks, the state of Georgia executed Warren McCleskey notwithstanding the fact that (1) he offered proof that blacks were systematically discriminated against in death penalty cases and (2) the state had concealed material evidence that might have caused the jury to vote against capital punishment. Many jurists and other persons sensitive to individual rights believe that McCleskey's execution was legally indefensible and morally unconscionable. Others simply argue that the determination that McCleskey should die was based on so uncertain and questionable a legal foundation that, at the very least, serious questions are raised as to whether the death penalty is being enforced in an arbitrary manner.

Recently, also, the Supreme Court upheld the Commonwealth of Virginia's decision to execute Roger Coleman, notwithstanding the fact that the constitutionality of Coleman's death sentence will never be determined because his lawyer inadvertently filed a notice of appeal three days late. *See Coleman v. Thompson,* — U.S. —, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Despite the magnitude of the price exacted, the Court stated that a capital defendant must "bear[ ] the risk ... for all attorney errors made in the course of representation." *Id.* 111 S.Ct. at 2567. Again, the question arises whether the death penalty is imposed on those most deserving of such punishment or whether arbitrary factors play a major role in determining who shall live and who shall die.

McCleskey's and Coleman's cases will surely be hotly debated whenever the question whether the death penalty is arbitrary is discussed. Would McCleskey have been put to death had the state not concealed evidence of its own duplicity? Would Coleman now be facing death if his lawyer had filed his notice of appeal three days earlier? We will never know. But we must nevertheless ask whether the factors that determine if a man is to be put to death are rational factors or not.

The uniqueness and severity of the death penalty require that we determine whether "valid penological reason[s]" support the selection "from among the many criminal defendants [of] the few who are sentenced to death." *Spaziano v. Florida,* 468 U.S. 447, 460 n. 7, 104 S.Ct. 3154, 3162 n. 7, 82 L.Ed.2d 340 (1984). Yet, under our present rules, whether a man lives or dies often seems to depend more on his lawyer's ability to negotiate the procedural morass we have made of the writ of habeas corpus than on the "relevant facets of the character and record of the individual offender [and] the circumstances of the particular offense." *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976). If that is so, we are clearly failing in our constitutional duty.

## III

In the present case, the constitutional arguments on the defendant's side are not as compelling as in McCleskey's case nor the facts as dramatic as in Coleman's. However, the procedural morass is present in the extreme, although this time it is the court not counsel which has fallen victim to it. The majority's procedural ruling regarding the retroactivity of *McCleskey v. Zant,* — U.S. —, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991) [*McCleskey II*], is just plain wrong. The error is critical because it is dispositive. It forecloses full and fair consideration of Harris' habeas petition. It

would not impart much information that the denial of certiorari does not already convey. By contrast, our rules allow a case to go unreviewed even when the vote is tied or there is only a one vote difference. The widely varying margins by which a suggestion for rehearing en banc can be rejected by our court of twenty-eight judges makes disclosure important.

In addition, Supreme Court Justices are free to record their votes in favor of granting certiorari if they so choose. In our circuit, the rules do not permit judges to disclose their votes except to the extent that such disclosure results incidentally from their participation in a dissent from a refusal to convene an en banc court. Thus, our rules result in the withholding of far more information than do the Supreme Court's.

is true that in this case the majority goes on to discuss the merits of Harris' petition, but such discussion (1) is dicta, (2) is influenced by the fact that the majority has already held that the petition is procedurally barred, and (3) as Judge Noonan ably demonstrates in his dissenting opinion, is itself clearly erroneous in a number of respects.

To return to the procedural issue, the majority holds that regardless of the merits of Harris' constitutional challenges to his capital sentence he is barred from habeas relief because he has abused the writ within the meaning of *McCleskey II.* It is worth noting that the government argued three years ago that Harris' second habeas petition constituted an abuse of the writ and should be summarily dismissed, but the very same judges who form the majority here joined with Judge Noonan in rejecting that argument. *See Harris v. Pulley,* 852 F.2d 1546, 1572 (9th Cir.1988) (citing *Richmond v. Ricketts,* 774 F.2d 957, 961 (9th Cir.1985)), *reaffirmed upon amendment,* 885 F.2d 1354, 1380 (9th Cir.1988). The difference in the result today is due to a single erroneous determination made by the present majority: that *McCleskey II,* decided subsequent to the filing of *all* of Harris' petitions, applies retroactively and bars a federal court from considering his current, earlier-filed claims. That determination is not only wrong; it is an error that may have caused the majority to view the merits of the petition with considerably less care than it might have exercised had it not deemed itself barred from considering them.

The principal reason the majority reaches its erroneous procedural determination is that it applies the wrong retroactivity standard. Without discussion, it assumes that the proper standard is that of *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), which turns almost entirely on the "newness" of the rule at issue. However, the proper standard is that developed in *Linkletter v. Walker,* 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), and *Solem v. Stumes,* 465 U.S. 638, 104 S.Ct. 1338, 79 L.Ed.2d 579 (1984) and applied by this circuit in *United States v. Givens,* 767 F.2d 574 (9th Cir.1985). The latter standard depends on a variety of factors designed to measure whether the defendant reasonably relied on an earlier rule and whether it would be inequitable to thwart this reliance by retroactively applying a new rule. Under the proper standard (and indeed, as I shall discuss later, even under the proper application of the wrong standard), *McCleskey II* is not retroactive and Harris is entitled to have his petition considered on the merits. Thus does procedure bring life (or death) to substantive rights—and to liberty interests.

The reason the *Teague* standard is not applicable is simple. That standard determines when the *state's* reliance on an earlier rule warrants nonretroactive application of the new one. Boiled down to its essentials, *Teague* (and its complement *Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987)) holds that, with some exceptions, a state is entitled to rely on the rule in effect at the time of trial in any cases in which direct review becomes final prior to the creation of the new rule; under *Teague,* in most instances a new rule is applicable only if its creation precedes final direct review. The date at which the defendant's avenues of direct review are exhausted is significant because *Teague* equates the state's reliance interest with its interest in the finality of its convictions. Prior to the defendant's conviction becoming final (that is, to direct review being exhausted), the state's interest is, supposedly, small and new rules will apply. Once the conviction is final, however, the state is presumed to have a strong interest in maintaining that finality. Further, according to *Teague,* the purpose of the writ of habeas corpus—ensuring state court faithfulness to federal law—is not defeated by restricting the writ to applications of law that should have been anticipated by the state courts. Accordingly, rules created after a defendant's conviction becomes final do not apply.

Of course, the state's reliance on an earlier rule is only implicated when the new

rule expands the defendant's rights. When the new rule contracts those rights, the state would be only too happy to have the new rule apply retroactively. In rights-contracting cases, it is the *defendant's* reliance on the old rule that is implicated. The defendant's reliance cannot, of course, be equated with an interest in maintaining the finality of his conviction; habeas petitioners by definition are attacking that very finality. Thus, application of the *Teague* standard to rights-contracting decisions borders on the irrational or the absurd.

The proper standard is that stated in *Givens:*

> (1) whether the decision establishes a new principle of law, (2) whether retroactive application will further or retard the purposes of the rule in question, and (3) whether applying the new decision [retroactively] will produce substantial inequitable results.

767 F.2d at 578. Under this (or any) standard, *McCleskey II* cannot properly be held to be retroactive, at least in the Ninth Circuit. First, *McCleskey II* is clearly new law in our circuit. Indeed, the very same panel that now holds *McCleskey II* retroactive, told Harris what the pre-*McCleskey II* standard for abuse of the writ was in *Harris v. Pulley*, 852 F.2d at 1572. The standard applied in Harris' earlier case was far more permissive of successive petitions than the standard imposed by *McCleskey II.*[3] Harris certainly was entitled to assume that the rule for successive petitions was the rule that was reaffirmed in his own prior case. *Cf. United States v. Albertini*, 830 F.2d 985, 989 (9th Cir.1987) ("If the due process clause is to mean anything, it should mean that a person who holds the latest controlling court opinion declaring his activities constitutionally protected should be able to depend on that ruling to protect like activities from criminal conviction until that opinion is reversed, or at least until the Supreme Court has granted certiorari.").

Second, thwarting Harris' reliance by applying *McCleskey II* retroactively works a substantial inequity. When Harris filed his second petition, he had no reason not to pursue those claims while investigating his current ones. Harris did everything necessary to preserve his then-existing right to file successive petitions; it is unjust to apply retroactively new requirements which Harris can no longer meet. *See Givens*, 767 F.2d at 579 ("[W]e refuse to impose subsequently-created requirements for preserving a claim on appeal on a defendant who did all that was necessary to comply with the law applicable at the time of his trial."). To impose on Harris the new requirements is to commit " 'the brutal absurdity of commanding a man today to do something yesterday.' " *United States v. Portillo*, 633 F.2d 1313, 1321 (9th Cir.1980) (quoting Lon Fuller, *The Morality of Law* 59 (1964), and denying retroactive effect to new procedural requirements for preserving the right to appeal rulings on the admissibility of prior convictions), *cert. denied*, 450 U.S. 1043, 101 S.Ct. 1763, 1764, 68 L.Ed.2d 241 (1981). Accordingly, under *Givens, McCleskey II* does not apply retroactively.[4]

As I noted earlier, even if *Teague* were the correct standard, a proper application of its criteria would preclude the retroactive application of *McCleskey II. Teague,*

---

**3.** Under the former standard,
> Previously unadjudicated claims must be decided on the merits unless [1] the petitioner has made a conscious decision deliberately to withhold them, [2] is pursuing "needless piecemeal litigation," or [3] has raised the claims only to "vex, harass, or delay."

*Harris v. Pulley*, 852 F.2d at 1572 (citing *Richmond*, 774 F.2d at 961). The *McCleskey II* standard is far stricter. Under *McCleskey II*, the petitioner must demonstrate "cause and prejudice" for his failure to bring the unadjudicated claims in the earlier petition. 111 S.Ct. at 1470. It is doubtful that the state could have demonstrated that Harris abused the writ within the meaning of the old standard; had the state been able to do so, the majority would have had no reason to reach the question of *McCleskey II*'s retroactivity.

**4.** It is unclear which way the remaining *Givens* criterion cuts. However, it is unnecessary to resolve the uncertainty because, under *Givens*, when "the first and third factors militate so strongly against retroactive application," retroactive application must be denied. 767 F.2d at 578.

as discussed above, holds that new rules do not apply on collateral review. In order to apply *McCleskey II* to Harris' petition, the majority finds that *McCleskey II* did *not* create a new rule. For reasons I have already alluded to in part, that finding is difficult to understand. In fact, it is remarkable. According to the Supreme Court, a decision announces a new rule if prior to its adoption a "reasonable, good-faith interpretation of existing precedents" could have constructed a different rule. *Butler v. McKellar,* 494 U.S. 407, 110 S.Ct. 1212, 1217, 108 L.Ed.2d 347 (1990). Specifically, if the standard for abuse of the writ was "susceptible to debate among reasonable minds" prior to *McCleskey II,* then *McCleskey II* created a new rule. *Id.* Because *Harris v. Pulley* actually applied a different, narrower standard for abuse of the writ, *see* 852 F.2d 1546, 1572 (9th Cir. 1988) (citing *Richmond v. Ricketts,* 774 F.2d 957, 961 (9th Cir.1985)), *reaffirmed upon amendment,* 885 F.2d 1354, 1380 (9th Cir.1988), the majority's current conclusion that *McCleskey II* is not new law is equivalent to the conclusion that its own earlier decision was one that could not have been reached by reasonable judges, *see Butler,* 110 S.Ct. at 1219 (Brennan, J., dissenting) (stating that under the rule announced in *Butler,* a new decision would apply retroactively to overrule an earlier decision only if the earlier decision "was *so* clearly invalid under then-prevailing legal standards that the decision could not be defended by any reasonable jurist.").[5]

I cannot believe that the majority's intent is to hold that its own earlier decision was irrational. Instead, the only plausible explanation is that it inadvertently overlooked the *Butler* rule, which it cites only in a different part of its opinion. Accordingly, having thus far erred twice with respect to *Teague,* the majority arrives at the wrong conclusion regarding retroactivity and deprives Harris of his right to a full and fair hearing. Ironically, regardless of which standard is applied, *Teague* or *Givens,* a proper application of the rule would result in the determination that *McCleskey II* is not retroactive and would thus allow review of Harris' petition.

The majority makes other mistakes, ably documented in Judge Noonan's dissent. Two errors are particularly disturbing: its determination that *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) does not afford the accused the right to be assisted by competent psychiatric experts during a capital sentencing proceeding in which the prosecution introduces psychiatric testimony, and its determination that such a rule would in any event not apply retroactively under *Teague* (yet another *Teague* retroactivity error). These determinations are not only erroneous; they are contrary to the view of the only other circuit to have decided the same *Ake* question. *See Buttrum v. Black,* 908 F.2d 695 (11th Cir.1990), *aff'g,* 721 F.Supp. 1268, 1312–13 (N.D.Georgia 1989). However, as I noted earlier, these errors may be somewhat more excusable given the majority's acknowledgment that the discussion in which they appear is not necessary to its disposition. And, because the errors are contained in dicta, they may not be as harmful in the long run as the holding regarding the retroactivity of *McCleskey II.* Nevertheless, the errors the majority commits in discussing the merits of Harris' petition, when added to the errors it commits in dismissing the petition under *McCleskey II,* make it clear that no sound legal basis has yet been advanced for rejecting Harris' claim for an evidentiary hearing.

## IV

We may expect an increasing flood of capital cases to come before us in the near future, including appeals from federal death sentences. As a result, we will be

---

5. The majority's conclusion that *McCleskey II* is not a new rule conflicts with a host of cases applying *Teague. See* Richard H. Fallon, Jr. & Daniel J. Meltzer, *New Law, Non–Retroactivity, and Constitutional Remedies,* 104 Harv.L.Rev. 1731, 1796 (1991) (discussing and agreeing with the conclusion of the Federal Courts Study Committee that the term "new rules" as used in *Teague* has been given an extremely broad definition in recent decisions) (citing I *Federal Courts Study Committee, Working Papers and Subcommittee Reports* 499–502 (1990)).

faced with a substantial addition to our workload. The proper resolution of death penalty appeals usually requires complex factual and doctrinal inquiries. Moreover, the severity and permanence of capital punishment mandates a greater scrutiny of the merits of capital appeals than we have time for in other cases. *See Spaziano v. Florida*, 468 U.S. 447, 459–60, 104 S.Ct. 3154, 3161–62, 82 L.Ed.2d 340 (1984). Despite the inordinate burden these death penalty cases will place on the court and its individual judges, we must assiduously perform our constitutional duty to provide the most careful scrutiny and thorough examination in *every* death row appeal.

En banc review is a critical safeguard in the capital punishment process. Ordinary concerns regarding judicial administration should not influence our judgment whether to grant further review to death penalty decisions that may be flawed by substantial errors of law. We have a special responsibility in death penalty cases to see that the Constitution and applicable statutes are fully complied with. There is no margin for error. In capital punishment appeals, neither judicial or administrative convenience nor any other reason can justify our deferring to the views of a three-judge panel if the majority of the court might, after further study, conclude that the conviction or sentence is unlawful. When a human life is at stake, we should provide en banc review in all cases in which legitimate questions exist concerning a panel's decision in favor of the state.[6] Harris most certainly qualifies under that standard, as he would under any reasonable test. Common decency and fairness—as well as due process—require that we rehear his case en banc. In the absence of such a hearing, the state of California should not be permitted to execute him. I deeply regret that we have decided otherwise.

## ORDER

Nov. 15, 1991.

Before ALARCON, BRUNETTI and NOONAN, Circuit Judges.

Appellant's motion for a stay of the mandate pending his application for a writ of certiorari is granted. Pursuant to Rule 41(b) of the Rules of Appellate Procedure, the mandate is stayed for a period of 60 days from the date of the filing of this order.

If, during the period of this stay, the Clerk of the Supreme Court shall file a notice that a petition for certiorari has been filed, the stay shall continue until final disposition of the petition for certiorari by the Supreme Court. If the Clerk of the Supreme Court should notify the Clerk of this court that the petition for a writ of certiorari has been denied, the mandate shall issue immediately.

ALARCON, Circuit Judge, dissenting:

I dissent from the order granting a stay of the issuance of the mandate pending the filing of a petition for a writ of certiorari in the Supreme Court.

On July 5, 1978, Robert Alton Harris murdered two teenagers because he wanted to use their automobile to commit a bank robbery. Eight months later, on March 6, 1979, a California jury convicted Harris of two counts of murder and recommended the death penalty. The California Supreme Court affirmed the conviction and upheld the sentence of death on February 11, 1981. The United States Supreme Court denied certiorari on October 5, 1981. *Harris v. California*, 454 U.S. 882, 102 S.Ct. 365, 70 L.Ed.2d 192 (1981).

On March 5, 1982, Harris filed his first federal petition for habeas corpus. The district court denied the first federal petition. While his first federal petition for habeas corpus was pending in this court, Harris filed a second federal petition for habeas corpus in the district court on August 13, 1982.

On September 16, 1982, this court affirmed the denial of habeas corpus relief on most of the issues raised by Harris. We reversed the denial of the first federal petition for habeas corpus on the ground that

---

**6.** Fed.R.App.P. 35 provides for en banc review when "necessary to secure or maintain uniformity" or "when the proceeding involves a question of exceptional importance." In my view, a death penalty case in which one or more substantial questions of law exists constitutes a case of "exceptional importance."

the California Supreme Court failed to undertake proportionality review of Harris' sentence. *Harris v. Pulley*, 692 F.2d 1189, 1196–97 (9th Cir.1982). The Supreme Court reversed our decision in *Pulley v. Harris*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).

The district court denied Harris' second federal petition for habeas corpus. On July 8, 1988, this court affirmed the denial of Harris' second federal habeas corpus petition. 885 F.2d 1354 (9th Cir.1989). The Supreme Court denied certiorari on January 16, 1990.

Harris filed a third petition for federal habeas corpus relief in the district court. The district court denied petition on March 28, 1990. A single judge of this court issued a stay and granted a certificate of probable cause. On August 29, 1990, this court affirmed the denial of Harris' third federal petition for habeas corpus relief. 913 F.2d 606 (9th Cir.1990) (as amended). We held that review of the claims of Harris' third petition is barred by Rules 9(a) and 9(b) of the Rules Governing Section 2254 Cases in the United States District Courts. *Id.* at 617. We concluded that Harris had abused the writ of habeas corpus procedure by delaying nine years in raising new issues concerning the competency of the psychiatrists his attorney selected to assist in the preparation of the defense. We concluded that the State of California was prejudiced by this delay because one of the psychiatrists is dead and the other is now working outside the United States and may be unable to recall the materials he reviewed more than 11 years ago. *Id.* at 618.

In *dictum*, we addressed the merits of each of Harris' claims "with the hope that all questions concerning the validity of the state court's judgment will finally be resolved after eleven years of writs and appeals." *Id.* at 618.

In his request for a stay, Harris asserts that the court's opinion addressed at least three issues of first impression in its *dictum*. Harris asserts that "these important, unsettled questions of law make it appropriate for this court to stay the mandate pending the filing and disposition of a petition for writ of certiorari." Harris' motion makes no reference to this court's holding affirming the denial of his third federal petition for a writ of habeas corpus. Thus, Harris apparently will ask the Supreme Court to review the clearly labeled *dicta* in the majority opinion, but not seek reversal of our holding that he has abused the writ under Rules 9(a) and 9(b).

Harris has not provided any basis for this court's further acquiescence in his skillful manipulation of the federal habeas corpus laws to avoid the execution of the judgment of the California court issued more than 12 years ago. Harris argues that this court has routinely stayed the mandate in death penalty cases. None of the cases he has cited involve the denial of a *third* federal petition for habeas corpus.

If the Supreme Court believes that it should review Harris' challenge to the *dicta* in this court's opinion, it has the power to grant a request to stay any execution date.

I decline to participate further in the unconscionable delays that have occurred in reaching a final determination in this matter. It is no wonder that Congress is presently reexamining the rules that permit state prisoners to seek federal habeas corpus relief. The Harris case is a textbook example of how the Great Writ can be abused.